**UNITED STATES of America,
Appellee,**

v.

**Saul SEMENSOHN, Defendant-Appellant.**

**Nos. 102, 103, Dockets 33118, 33521.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1969.

Decided Feb. 6, 1970.

Vincent J. Favorito, Asst. U. S. Atty., Vincent T. McCarthy, U. S. Atty., for appellee.

Myron J. Greene, Howard R. Udell, New York City, for defendant-appellant.

Before LUMBARD, Chief Judge, and WATERMAN and KAUFMAN, Circuit Judges.

WATERMAN, Circuit Judge.

Appellant Semensohn, following a jury trial in the United States District Court for the Eastern District of New York, appeals his conviction upon both counts of a two count indictment. He was convicted of having knowingly and wilfully evaded military service by submitting false and fraudulent information to his local draft board in which it was stated that he was in a Reserve Unit when in fact he was not, and also of having knowingly and wilfully made a false statement bearing upon his classification for military service, both in violation of 50 U.S.C. App. § 462(a).

We reverse the conviction and remand the case for a new trial, for the accused, who took the stand in his own defense, was unfairly prejudiced by the cumulative effect of improper questions asked of him by the government attorney.

Semensohn took the stand in his own behalf so as to rebut the Government's evidence that he had "knowingly and wilfully" evaded military service. A witness for the prosecution, Paul Miller, had testified that he had been introduced to Semensohn in order to help him evade the draft. At this meeting Miller testified he explained that he would arrange to have a fraudulent DD-44 form submitted to the defendant's local draft board, and he represented that thereby appellant's classification would be changed to 1-D, making him ineligible for the draft.[1] The price for Miller's service was $1700, which amount defendant paid. Miller turned over information he had copied from Semensohn's draft card to a confederate, Solomon Gottfried. Gottfried was called as a government witness and testified that he filled out the DD-44 form in defendant's name, signed the alleged name of the Administrative Officer of a Reserve Unit, and mailed it to Semensohn's draft board. While in the service Gottfried had been a sergeant in charge of recruiting, was quite adept at filling out DD-44s and had carried his military skills into civilian life. Miller paid him $200 for every form sent to various draft boards. Gottfried testified, however, that he had never met or spoken with Semensohn nor sent him any papers for his signature.

On direct examination Semensohn testified that he was not aware of any irregularity connected with Miller's efforts on his behalf; that he believed he was actually in the Reserves; and that he had never seen a DD-44 form and had never given his benefactor any false information.

In an effort to impeach the defendant's credibility, the prosecutor asked on cross-examination: "Now, you were convicted of grand larceny, weren't you?" The defense objected to the asking of the question, and, during the ensuing bench conference, it appeared that Semensohn had pleaded guilty in a New York court to the crime of attempted grand larceny in the third degree, a class A misdemean-

---

1. The DD-44 form was received by defendant's Local Board. It contained the defendant's name, address, selective service number, date of birth, and Local Board number, and a statement that defendant was serving satisfactorily in a reserve unit of the United States Air Force Reserve assigned to Stewart Air Force Base. Defendant was reclassified as Miller promised he would be.

or, but had not as yet been sentenced on the plea, and had never even been charged with having committed the felony of grand larceny. The objection to the question was consequently sustained, but a defense motion for a mistrial based upon it was denied.

■ It is settled that in a trial a witness's acts of misconduct are not admissible to impeach his credibility unless the acts resulted in the obtaining of a conviction. It is also settled law that a conviction does not become a final conviction until sentence has been imposed and until the time for an appeal from the judgment has expired. Newman v. United States, 331 F.2d 968, 972 (8 Cir. 1964), cert. denied, 379 U.S. 975, 85 S. Ct. 672, 13 L.Ed.2d 566 (1965); Fenwick v. United States, 102 U.S.App.D.C. 212, 252 F.2d 124, 126 (1958); Beasley v. United States, 94 U.S.App.D.C. 406, 218 F.2d 366, 368–369 (1954), cert. denied, 349 U.S. 907, 75 S.Ct. 584, 99 L. Ed. 1243 (1955); Campbell v. United States, 85 U.S.App.D.C. 133, 176 F.2d 45, 47 (1949). As was said in Campbell v. United States, *supra* at 47:

> If the judgment of conviction is later reversed, the defendant has suffered, unjustly and irreparably, the prejudice, if any, caused by the disclosure of the former conviction.

In the case at bar, the defendant's former misdemeanor conviction lacked the certainty and finality to warrant its prejudicial use against him at trial even if the prosecutor's question had referred to it, for, though Semensohn had pleaded guilty to the misdemeanor charge, he had not been sentenced and could have sought to withdraw his plea prior to sentencing.

■ The Government concedes its error, but maintains that any prejudice created by the improper reference to a prior act of misconduct was cured by the court's prompt statement to the jury:

> Gentlemen of the Jury, I have considered the last question that was asked and have determined that it was an improper question. It is a rule of

law that you can't show guilt of one charge by guilt or innocence of a different charge and you are to pay no attention to the question that was asked. Just treat it as if it did not exist on the record.

■■ A judge's corrective statement will rarely completely cure the prejudicial damage created when improper information reaches the ears of the jury. "[P]rejudices which are so easily aroused are not thus so readily expunged." State v. Stago, 82 Ariz. 285, 312 P.2d 160, 161 (1957). More strongly put, Mr. Justice Jackson said: "The naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction." Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (concurring opinion). Cf. Bruton v. United States, 391 U.S. 123, 129, 88 S. Ct. 1620, 20 L.Ed.2d 476 (1968). Of course corrective statements must be considered within their context, for some trial errors have only a marginal prejudicial impact when viewed against the background of the case as a whole and thus may be cured by appropriate instructions. In the present case, however, the issue is presented as to whether the prosecutor's error was harmless enough to be disregarded, or whether, despite the corrective admonition, it affected the substantial rights of the accused. Fed.R.Crim.P. 52(a). Before an error of this sort can be considered harmless the prosecution must have proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). And the converse of this rule is that error is not harmless if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963).

Whether the corrective charge in the circumstances of this case rendered the

prosecutor's improper question harmless depends on the degree of initial prejudice the asking of the unanswered question created in the minds of the jurors, the quality and forcefulness of the corrective charge as given, and the strength of the Government's case.

The initial effect of the insinuation cast by the prosecutor's question was fraught with prejudice. The jury could infer that they were being asked to believe or disbelieve the story being told by a convicted felon, now being brought to justice again, when in truth the accused had never been convicted of the felony set forth in the question, and, indeed, had not been finally convicted of even a misdemeanor.

Moreover, the court's admonition was inadequate to dispel the prejudice naturally aroused by the prosecutor's unfortunate attack upon the defendant's credibility. The jury might well have inferred from the judge's remarks that the accused had, indeed, been convicted of grand larceny and, but for a legal technicality, the jury was not to consider that fact in weighing the accused's guilt or innocence of Selective Service violation. It flies in the face of logic and common sense to think that the jury would overlook the insinuation that Semensohn had a grand larcenous past when weighing the question of his truthfulness. As given, the court's instruction only underscored what the Government had amply insinuated. At the very least an appropriate instruction under the circumstances should have stated that the prosecutor was, so far as court and counsel knew, mistakenly informed when he asked the question.

The accused's credibility was the crucial issue in the case. The Government's case rested solely on the testimony of Semensohn's benefactors, who were themselves admittedly involved in more than one "draft scandal" and who made it their business to profit from those imminently close to induction into military service. Pitted against their somewhat dubious compulsion to tell the truth was the defendant's version that he had been duped into thinking he was actually in a Reserve Unit. Apparently the jury had been convinced beyond a reasonable doubt that the accused had "knowingly and wilfully" evaded military service, a result which depended upon the witnesses they believed. Thus, it was crucial to Semensohn that he appear to be telling the truth, and the prosecutor's unwarranted assault upon his credibility clearly tended to undermine his only defense, that he was the innocent victim of the criminal enterprise of the Government's witnesses.

Under the circumstances we hold that the conviction below must be reversed. We need not, however, base our reversal upon the above prejudical error alone, for other errors found in the record, when viewed in combination with this one, remove any doubt that the accused was unfairly prejudiced during this trial and is entitled to a new trial.

In an effort to shake Semensohn's story that he believed at all times that he was a member of a Reserve Unit, the following occurred on his cross-examination:

Q. Did you ever tell the FBI that you thought you were in the actual reserves? A. I didn't discuss it with them at all.

Q. They never asked you the question; is that right? A. They asked me questions; I didn't discuss it with them.

Q. Did you ever refuse to answer questions they asked? A. They told me I was entitled to an attorney.

 Such questions clearly violated the defendant's Fifth Amendment right to remain silent. As we stated in United States v. Mullings, 364 F.2d 173, 175 (2 Cir. 1966), when we were considering the admissibility of testimony relative to a defendant's failure to make exculpatory statements while under arrest:

[The defendant] was under no duty to say anything and his failure to speak should not have been considered against him. Having been placed under arrest he had the right to remain

silent. It is well settled that an inference of guilt may not be drawn from a failure to speak or to explain when a person has been arrested.

Accord, Gillison v. United States, 130 U.S.App.D.C. 215, 399 F.2d 586, 587–588 (1968); cf. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

When this line of cross-examination was opened the defense objected to it but failed to apprise the court of its particular constitutional impropriety. The following day, prior to summations, defense counsel renewed his objection on the proper ground and moved for a mistrial. The motion was denied. Prior to sentencing, another motion, this time to set aside the verdict and for a new trial, was made, in which reliance was placed upon the same ground. This was also denied.

■ The Government contends that inasmuch as defense counsel failed to include in his first objection the proper reason therefor, the court was prevented from taking curative steps at the earliest possible moment, and so the defense waived the point. United States v. Indiviglio, 352 F.2d 276 (2 Cir. 1965) (in banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). The *Indiviglio* rule is not a hard and fast rule, however, and an appellate court has discretion, depending on the circumstances, to notice alleged error under Rule 52(b) of the Federal Rules of Criminal Procedure:

> Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

In sum, inasmuch as an objection to the prosecutor's line of inquiry, albeit on the wrong ground, was promptly made, and the court's attention was focused upon the proper reason therefor prior to the close of the case; and, in view of the prejudice created by the unconstitutional inference inherent in the questions and their answers, the importance of the defendant's credibility to his defense, and the accumulation of errors affecting that credibility, we are convinced "there is a reasonable possibility" that the latter error "might have contributed to the conviction."

We therefore find that Semensohn was denied a fair trial by the cumulative effect of improper questions addressed to him on two occasions during cross-examination.

Reversed and a new trial ordered.