Stanley **ROTHSCHILD**, Plaintiff,

v.

**STATE OF NEW YORK et al.,**
Defendants.

No. 75 Civ. 270 (HFW).

United States District Court,
S. D. New York.

Feb. 10, 1975.

Victor J. Herwitz, New York City, for plaintiff.

Louis J. Lefkowitz, Atty. Gen., by Jonathan Lovett, Asst. Dist. Atty., New York City, for defendants.

MEMORANDUM DECISION

WERKER, District Judge.

The petitioner is a former New York City policeman convicted in New York Supreme Court of grand larceny in the first degree and attempted grand larce-

ny, both by extortion.[1] His conviction[2] was unanimously affirmed by both the Appellate Division of that court[3] and by the New York Court of Appeals.[4] The gravamen of the petition for writ of habeas corpus is that the trial court committed errors of constitutional proportions in permitting the prosecutor to bring out on Rothschild's cross-examination his "good intentions" in doing the acts alleged to constitute attempted grand larceny and then impeach that testimony by bringing out his failure to explain those intentions upon or after arrest. Specifically Rothschild points to the trial court's refusal to permit him to testify on direct that his intention had been merely to arrest the complainant for bribery,[5] and argues that (1) using evidence of post-arrest silence at trial, even for purposes of impeachment alone, violates the defendant's fifth amendment right to remain silent; (2) Rothschild's post-arrest silence is not inconsistent with his trial testimony and therefore can not be used to impeach; and (3) the district attorney in any case can not cross-examine as to areas not covered by direct testimony in order to lay a foundation for impeachment.

Although this court is in agreement with petitioner's arguments, as discussed below, it denies the petition for writ of habeas corpus because the record reveals overwhelming evidence of Rothschild's guilt; any errors committed by the trial court were "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967); cf. United States v. McCarthy, 473 F.2d 300, 304–05 (2d Cir. 1972). In Chapman the Supreme Court stated:

> We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circum-

1. Section 155.05 of the New York Penal Code, McKinney's Consol.Laws, c. 40, defines larceny as follows:
 1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.
 2. Larceny includes a wrongful taking, . . ., with the intent prescribed in subdivision one of this section, committed in any of the following ways:
 
 \* \* \* \* \*
 
 (e) By extortion.
 
 \* \* \* \* \*
 
 Section 155.40 states in pertinent part:
 A person is guilty of grand larceny in the first degree when he steals property and when the property, regardless of its nature and value, is obtained by extortion committed by instilling in the victim a fear that the actor or another person will . . . (c) use or abuse his position as a public servant by engaging in conduct within or related to his official duties, . . ., in such manner as to affect some person adversely.

2. May 31, 1972, New York County.

3. May 24, 1973, without opinion.

4. November 27, 1974 (Opinion No. 487).

5. When the defendant's attorney attempted to elicit the reasons defendant acted as he did, the court stated:

> I don't think reasons are proper questions. The point is he went there and from what he tells us the conversation was will [sic] gather his reasons. That is the way it is supposed to be done. He doesn't have to give us his thinking.

Tr. 452. Later, on the record but out of the jury's hearing, the following colloquy took place:

> Mr. Herwitz: \* \* \* I respectfully submit that the operation of his mind, and his reasons for doing what he had [sic] are relevant, and admissible. This generally is the area of proof that I wish to develop.
> Mr. Gershman: I object to any after-the-fact testimony as to what his mental state was 28 months ago. It is clearly inadmissible as hearsay. For those reasons I object to it.
> The Court: \* \* \* I do sustain Mr. Gershman's objection to his using his reasoning processes to tell what his intention was.
> In other words, the jury can infer a man's intention from the acts that he does. I have no objection nor would I sustain an objection to any questions that you ask with reference to his acts as bringing out his intentions, but I certainly think it's improper for you to say to him, what was your reason for saying $12,000, or how did you happen to say $12,000, what did you mean by saying it?

Tr. 462–463.

stances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. We decline to adopt any such rule. All 50 States have harmless-error statutes or rules, . . . . All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.

*Id.*, 386 U.S. at 21–22, 87 S.Ct. at 827. In this case the court is convinced that the jury would have chosen to convict the petitioner even if Rothschild had been permitted to testify on direct as to his intentions, and the district attorney had been precluded from cross-examination as to post-arrest silence.

The New York Court of Appeals summarized the evidence against Rothschild as follows:

> On October 21, 1969, defendant and other Narcotic Division officers, armed with a search warrant, entered the apartment of Geraldine Williams, the common law wife of William Mathis, Jr. They threatened to send her to jail on a trumped up charge and to deprive her of her children unless she called her "father-in-law," William Mathis, Sr. [Mathis] to make arrangements to have him come to the apartment immediately. Frightened, she complied, and upon Mathis' arrival, defendant demanded $6,000 from him, threatening to send Miss Williams to jail if he did not comply. Mathis left and, after a short while, returned and paid the money, whereupon defendant and his companions departed.

> Thereafter, and on December 6, the defendant again sought out Mathis, this time on the pretext that he wanted to locate Mathis' son . . . whom he wanted to interrogate regarding a narcotics investigation. The defendant then advised Mathis

that he could "[smooth] things over" for $12,000 and, of course, he would not then need to locate the son. Mathis protested that he had no money but agreed to meet with the defendant at a later date. Mathis then went to police headquarters where he related all these events to the officers in command. Following their instructions, he met with the defendant and agreed to pay the money in installments, the first to be made on December 11. On that date, the police gave Mathis $280 in marked bills, wired his establishment with recording devices and several officers secreted themselves on the premises. Upon defendant's arrival, Mathis engaged him in conversation * culminating in defendant agreeing to accept the money in installments. When Mathis handed defendant the marked money, the officers entered the room, revealed their identity and arrested him.

> * The recorded conversation referred to the October 21 extortion and defendant expressed no surprise when Mathis complained that "6,000 in two months . . . two months ago, and now twelve . . . where the hell am I going to get that kind of money." . . . [D]efendant inquired "(h)ow much will you pay me?" and after Mathis replied $300 now and $500 per week, defendant acceded. Defendant does not dispute the accuracy of the recording. He complains only that it was of poor quality and that his statements were taken out of context.

This evidence was presented through the testimony of Mathis, Mathis Jr., Geraldine Williams and the arresting officers, and was in large measure confirmed by the tape recording of the December 11th conversation. The only defense presented as to the attempted grand larceny charge was that of "good intentions," *i. e.*, that he had been approached by Mathis and had agreed to accept the money offered only in order to arrest him for bribery.

 Had there been less than overwhelming evidence of guilt, this court would be inclined to grant petitioner a writ of habeas corpus. Relevant case

law in both the federal and state courts clearly provides that where a defendant's intent is in issue he should be permitted on direct examination to testify as to that intent. Crawford v. United States, 212 U.S. 183, 202–03, 29 S.Ct. 260, 53 L.Ed. 465 (1908); United States v. Kyle, 257 F.2d 559, 563 (2d Cir. 1958); People v. Levan, 295 N.Y. 26, 33–34, 64 N.E.2d 341 (1945); People v. Stewart, 37 A.D.2d 908, 325 N.Y.S.2d 533 (4th Dept. 1971). *See also* United States v. Hayes, 477 F.2d 868, 873 (10th Cir. 1973) and cases cited therein. In this case the defendant was precluded from doing so in any but the most indirect manner (see note 5, *supra*). At each attempt the trial court sustained objections to such testimony as hearsay.[6]

In Harris v. New York, the Supreme Court confirmed with respect to illegally obtained statements what has long been hornbook law in New York, that evidence not admissible on the prosecution's direct case may be used on cross-examination to impeach the defendant's credibility as a witness. This can occur, however, only when the defendant has opened the door by testifying to the matter on direct examination. People v. Rahming, 26 N.Y.2d 411, 418, 311 N.Y.S.2d 292, 298, 259 N.E.2d 727, 731 (1970); People v. Harris, 25 N.Y.2d 175, 177, 303 N.Y.S.2d 71, 72, 250 N.E. 2d 349, 350 (1969), aff'd, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); People v. Miles, 23 N.Y.2d 527, 542–45, 297 N.Y.S.2d 913, 924–26, 245 N.E.2d 688, 696–97 (1969). The purpose of allowing such impeachment use of inadmissible evidence is to prevent the defendant from "affirmatively resort[ing] to perjurious testimony in reliance on the Government's disability to challenge his credibility." Walder v. United States, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L. Ed. 503 (1954). *Accord* Harris v. New

York, *supra*, 401 U.S. at 226, 91 S.Ct. 643.

In the Rothschild trial, although defendant did testify as to his intention, he did so not on direct, but on cross-examination at the prosecutor's behest. This is a different situation than that found in Harris v. New York, where the prosecution "did no more than utilize the traditional truth-testing devices of the adversary process." 401 U.S. at 225, 91 S.Ct. at 645. To allow the district attorney to impeach testimony which he himself had elicited for the first time in the same cross-examination is to allow the state to build a case against the defendant's credibility by bootstrapping. This is clearly not permissible. *See* Agnello v. United States, 269 U.S. 20, 35, 46 S.Ct. 4, 70 L.Ed. 145 (1925); People v. Rahming, *supra*; People v. Schwartz, 30 A.D.2d 385, 292 N.Y.S.2d 518, 522 (1968).

The petitioner also urges that although impeachment use of prior inconsistent statements has been upheld by the Supreme Court, such use of post-arrest silence in this case was not constitutionally correct because Rothschild's silence is not in any way inconsistent with his later statements at trial. The New York Court of Appeals rejected this argument:

Here we are presented only with the question of whether non-utterances, or silence, may be used against the defendant on cross-examination, when such silence is patently inconsistent with the defense asserted, and there is a patent obligation to speak. * * * The natural consequences of his status as a law enforcement officer would require him to promptly report any bribe or attempted bribe to his superiors, and certainly protest and reveal such an alleged scheme after his ar-

---

6. This court fails to understand how relevant testimony by the defendant as to his own intent could be hearsay. Even if such testimony contained reference to statements of others it would surely fall within the state-of-mind-in-issue exception to the hearsay rule. *See* Matter of Bergstein v. Board of Education, 34 N.Y.2d 318, 324, 357 N.Y.S.2d 465, 313 N.E.2d 767 (1974).

rest to them, and to his fellow officers as well.

The court appears to have based its conclusion that Rothschild was under a "patent obligation to speak" on the fact that he was a policeman. While he may indeed have had such an obligation prior to his arrest, this court fails to understand how he could have remained under that obligation *after his arrest*, when he was immediately suspended [7] from the force and placed in a classic custodial position vis-a-vis his former colleagues.[8] Having served as a police officer he surely knew his Miranda warnings, and like any other suspect in police custody, he was entitled to rely on his privilege not to discuss the alleged violations with his captors. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Since he was relieved of police duties and obligations upon his arrest and immediate suspension, his silence at that time does not appear to this court *patently* inconsistent with the defense asserted at trial. Petitioner argues in any case that whether inconsistent or not, post-arrest silence can not be used to impeach.

Whether, in light of Harris v. New York, *supra,* silence at the time of arrest can be used as a prior inconsistent "statement" or "act" to impeach exculpatory trial testimony is a question as yet undecided in this circuit.[9] In pre-*Harris* cases, however, the Court of Appeals has found cross-examination along such lines to be "clearly violat[ive of] the defendant's Fifth Amendment right to remain silent." United States v. Semensohn, 421 F.2d 1206, 1209 (2d Cir. 1970). In that case the defendant was convicted of knowingly and wilfully informing his local draft board that he was in a Reserve Unit when in fact he was not. In an effort to shake his testimony on direct that he had actually believed himself a member of a Reserve Unit, the Assistant United States Attorney cross-examined Semensohn as to whether he had told the FBI on arrest of that belief. The Court of Appeals found an "unconstitutional inference inherent in the questions and their answers": [10]

> As we stated in United States v. Mullings, 364 F.2d 173, 175 (2d Cir. 1966), when we were considering the admissibility of testimony relative to a defendant's failure to make exculpatory statements while under arrest:
>
>> [The defendant] was under no duty to say anything and his failure to speak should not have been considered against him. Having been placed under arrest he had the right to remain silent. It is well settled that an inference of guilt may not be drawn from a failure to speak or to explain when a person has been arrested.

421 F.2d at 1209–10. *See also* United States ex rel. Young v. Follette, 308 F. Supp. 670, 672 n. 2 (S.D.N.Y.1970).

---

7. "Proper discipline of the police force demands a power of immediate suspension even before specific charges are formulated and served." Brenner v. City of New York, 9 A.D.2d 729, 192 N.Y.S.2d 449 (1st Dept. 1959).

8. The Court of Appeals has previously held that suspension of a New York City policeman "implies that the official is relieved of duty during the interval", and does not continue to perform his services on the force. Brenner v. City of New York, 9 N.Y.2d 447, 452, 214 N.Y.S.2d 444, 446, 174 N.E.2d 526, 528 (1961). *See also* Gould v. Looney, 60 Misc.2d 973, 304 N.Y.S.2d 537, 542 (S.Ct.

Nassau 1969). If a policeman on suspension is relieved of all police duties is he not also relieved of police "obligations?"

9. The question was recently raised on appeal in United States v. Rose, 500 F.2d 12, 17 (2d Cir. 1974) ; however, the court determined that "[s]ince Rose's counsel failed to object to the examination during the trial, we need not reach the merits of whether the government may show the defendant was silent upon arrest because that is inconsistent with the defendant's trial testimony."

10. 421 F.2d at 1210.

Rulings in other circuits have varied,[11] and the Supreme Court has agreed to consider the issue on review of the decision in United States v. Hale, 162 U.S.App.D.C. 305, 498 F.2d 1038 (1974). In that case the Court of Appeals for the District of Columbia found no inconsistency between a defendant's exercise of a constitutional right to remain silent and his subsequent exculpatory testimony at trial, distinguishing Harris v. New York on the ground that Harris "did not exercise his constitutional right to remain silent, but rather *spoke*, albeit without first being advised of his right": [12]

> The Supreme Court has proscribed comment by a court or prosecutor on the fact that a defendant did not testify at trial on the ground that such comment "cuts down on the privilege by making its assertion costly." Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 . . . The Court, relying upon this analysis, then ruled in *Miranda* that it is "impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation." The rationale for this rule was articulated by Justice Black in his *Grunewald* [Grunewald v. United States, 353 U.S. 391,

77 S.Ct. 963, 1 L.Ed.2d 931] concurrence:

> [There are] no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them. It seems peculiarly incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution. 353 U.S. at 425–26, 77 S.Ct. 963.

Nothing in *Harris* undercuts this fundamental constitutional principle since Harris did not involve assertion of the constitutional right.

 This court finds the *Hale* rationale persuasive particularly in this case where, as noted before, the defendant did not directly testify to the matter on which he was impeached. Even this combination of errors, however, cannot outweigh the record's overwhelming evidence against petitioner. That evidence mandates the conclusion that the errors cited were harmless beyond a reasonable doubt. The petition for a writ of habeas corpus is consequently denied.

So ordered.

---

11. United States v. Ramirez, 441 F.2d 950, 954 (5th Cir.) cert. denied, 404 U.S. 869, 92 S.Ct. 91, 30 L.Ed.2d 113, reh. denied, 404 U.S. 987, 92 S.Ct. 445, 30 L.Ed.2d 371 (1971) (constitutionally permissible: "the cross-examination falls clearly within the ambit of Harris v. New York".); United States ex rel. Burt v. New Jersey, 475 F.2d 234, 236–38 (3d Cir. 1973) (permissible); Johnson v. Patterson, 475 F.2d 1066, 1068 (10th Cir.), cert. denied, 414 U.S. 878, 94 S.Ct. 64, 38 L.Ed.2d 124 (1973) (impermis-

sible: "silence at the time of arrest is not an inconsistent or contradictory statement . . . is simply the exercise of a constitutional right that all persons must enjoy without qualification.") ; Agnellino v. State of New Jersey, 493 F.2d 714, 719–25 (3d Cir. 1974) (permissible); United States v. Hale, 162 U.S.App.D.C. 305, 498 F.2d 1038, 1042 (1974) (impermissible), cert. granted, 419 U.S. 1045, 95 S.Ct. 616, 42 L.Ed.2d 639.

12. 498 F.2d at 1043.