**Juan P. RAMOS, Petitioner,**

v.

**Richard A. SEIDL, Acting Superintendent of the New Jersey State Prison at Leesburg, Respondent.**

Civ. No. 79–198.

United States District Court, D. New Jersey.

Nov. 5, 1979.

Lowenstein, Sandler, Brochin, Kohl & Fisher, Newark, N.J., for petitioner.

State of New Jersey, Office of the Atty. Gen., Appellate Section-Essex Region, Newark, N.J., for respondent.

## OPINION

LACEY, District Judge.

Petitioner in this habeas corpus action, 28 U.S.C. § 2254, is confined at the New Jersey State Prison in Leesburg where he is serving a 10-to-12-year sentence for robbery. N.J.S.A. 2A:151–5. He was also convicted of armed robbery, for which he is serving a 2-to-3-year sentence concurrent with the robbery sentence, and kidnapping, for which he received a suspended sentence of 30 to 35 years. N.J.S.A. 2A:141–1; N.J.S.A. 2A:118–1.[1]

On appeal the Appellate Division of the Superior Court set aside the conviction for receiving stolen goods but affirmed the convictions on the remaining counts. The New Jersey Supreme Court denied certification. The petitioner has filed no other appeals or applications, save for the petition in this court.

To support the petitioner's contention that he is being held in custody in violation of the United States Constitution, he urges: (1) prosecutorial misconduct denied him a fair trial; (2) his right not to be a witness against himself was violated; and (3) his right to seek counsel was violated. Each of these claims was properly raised in the state courts, so the requirement of exhaustion of state remedies has been met.

■ Though the petitioner presents three grounds for finding his conviction to have been secured unconstitutionally, all stem from a single aspect of the trial—the prosecution's attempt to impeach the defendant's credibility. Whether the prosecution's effort at impeachment violated the petitioner's constitutional rights can be determined only in the context of the trial as a whole.

Essentially, the outcome of the case hinged on a credibility determination by the jury. The State's theory was that the petitioner had planned and arranged the hijacking of a truck. Two participants in the crime testified in direct support of this theory. Though other prosecution witnesses testified, the State's only evidence linking the petitioner to the crime came from the two participants.

James Burr was the first witness to implicate the petitioner. According to Burr, the petitioner masterminded the hijacking. Burr, who described the planning and committing of the crime in detail, had pleaded guilty to participating in the hijacking. On direct examination he testified that in return for the guilty plea he was informed that the State would recommend that his sentence not exceed 30 years,[2] that a charge involving counterfeit currency would be dropped (4 Tr. 71), and that after the petitioner's trial was concluded the State would speak to the sentencing judge. (4 Tr. 73). Burr had one previous conviction—a 1970 conviction for robbery—for which he received a sentence of 5 to 7 years. (4 Tr. 74). On cross-examination Burr testified that he had faced a possibility of 55 years in prison for the crimes to which he pleaded guilty (5 Tr. 30); he also stated that as part of the plea bargain the prosecutor would advise the sentencing judge of the "quality and the quantity of my testimony." (4 Tr. 34). Burr also admitted that he hoped to benefit himself through the testimony he gave at the trial. (5 Tr. 36).

The second witness linking the petitioner to the hijacking was Dannie Mobley. He, too, testified that the petitioner conceived the plan to hijack the truck. Mobley had pleaded guilty to three counts arising out of the hijacking; unlike Burr, however, he had not yet been sentenced. (7 Tr. 17). It was his testimony both on direct and on cross-examination that no promises had been made with respect to his sentence and that he expected nothing in return for his guilty plea. (*Id.*; 7 Tr. 45). At the time of his

---

1. An additional sentence of 3 to 5 years for receiving stolen goods was vacated on appeal.

2. Burr actually received a sentence of 8 to 11 years (4 Tr. 70–71).

testimony Mobley also faced robbery, kidnapping, assault and conspiracy charges in Monmouth County. He had pleaded not guilty to those charges (7 Tr. 17), and, in any event, expected no leniency for those crimes. (7 Tr. 18, 48).

Six witnesses testified for the defense. The first three witnesses—a businessman, a priest, and a minister—testified favorably concerning the petitioner's reputation for veracity and being a law-abiding citizen. Eusebio Medena, testifying for the petitioner, asserted that Dannie Mobley had known the petitioner for many years. (8 Tr. 57). This testimony was introduced in an attempt to attack the credibility of Mobley, who had said that he had known the petitioner for only a month when the crime occurred. (7 Tr. 55). Juan Ramos, the petitioner's son, testified that he had known Mobley for at least four years. (8 Tr. 63).

The final defense witness was the petitioner. He testified that Mobley first worked for him nearly six years ago. (8 Tr. 70). Emphatically and repeatedly the petitioner denied any involvement in the hijacking. (8 Tr. 85–88).

Cross-examination by the prosecution then began. Much of the questioning focused on events after the petitioner had been arrested. For example, the prosecutor asked the petitioner if he had told a police officer he had friends "downtown." (8 Tr. 100). The petitioner remembered making such a statement, but he tried to give the phrase a different meaning than the one suggested by the prosecutor. (8 Tr. 101). Defense counsel then objected to the entire line of questioning on the ground that no evidence should be offered on events transpiring after the crime. (8 Tr. 103). The objection was overruled.

Continuing this line of inquiry, the prosecutor asked the petitioner about whether he had refused to cooperate with the Newark police and whether he had asked for an attorney the day of his arrest. When the petitioner denied acting uncooperatively,

the prosecutor told the court he intended to have Officer McDonald testify on that issue and whether the petitioner had made a statement about friends "downtown." (8 Tr. 109). The prosecutor, after eliciting from the petitioner a reaffirmation that he had requested an attorney the day of his arrest, then asked if he had been read a form containing his rights. (8 Tr. 113).

Q Did they read you at any time a form about your rights?

A Not that I remember. They just tell me we got this here this and this. That four papers sign your name here and I said I can't sign my name without my lawyer.

Q And did they read you your rights from a form?

A If they did he was so mad at me I don't remember exactly, no.

Q You don't remember.[3] . . .

Q I show you these four pieces of paper, did they read you your rights from these pieces of paper both in English and Spanish?

A No.

. . . . .

Q You were never read your rights on . . . [the day of your arrest]?

A No, sir.

(8 Tr. 113–17).

After the petitioner completed his testimony, Mobley, as a rebuttal witness, testified that he had known the petitioner for about a month and a half. (8 Tr. 136). Then Officer McDonald took the stand.

McDonald, who had been one of the arresting officers, testified for the purpose of undermining the petitioner's credibility. (See 8 Tr. 136). He asserted that the petitioner had indeed been informed of his rights. (8 Tr. 140). Asked who had read the rights, McDonald answered as follows:

Detective Guerino read him his rights in English and he refused to sign that. We asked if he could speak Spanish or under-

---

**3.** The *Miranda* waiver forms were then marked for identification. Later, they were admitted into evidence as State's exhibits 88–91.

stand Spanish, he stated he could understand Spanish. Detective Guerino presented this copy in Spanish to him and he read the words to this here on that first date and he refused to sign both. Detective Guerino also marked on here he refused to sign.

(8 Tr. 140).[4]

Shortly thereafter a sidebar conference was held. Defense counsel said that in view of the testimony that *Miranda* rights had been read to the petitioner, he intended to obtain testimony on the wording of the documents. (8 Tr. 143). The prosecutor then explained his reasons for putting in evidence the giving of *Miranda* warnings.

I'm not offering this to show that the man tried to conceal anything, that's not my purpose. He was read his rights and he has a right not to sign it if he refuses, that's fine. That's not what bothers me. What he said that *[sic]* his rights were never read to him and that is the only reason why I am bringing this up. It goes to his credibility on that issue alone and I don't think anything that's contained in here other than the fact that it was said to him and the fact that he refused to sign it, the fact that it was read to him we're able to go into. There's no question that he has the right not to sign it. I'm just offering this witness to show that it was read to him. Not that he didn't sign it or not why he didn't sign it, that's not evidential, I can't go into that, I don't intend to go into that, but just to show that these rights were read to him.

(8 Tr. 144–45).

The sidebar then turned to a discussion as to the correct wording of a question designed to determine how much force had been applied in trying to get the petitioner to sign the waiver. The prosecutor suggested "try to make him sign," defense counsel offered "requested," and that phrase was adopted.

Q  Was he requested to sign these pieces of paper?

A  Yes, he was, sir.

Q  You indicated that he refused?

A  That's right.

.      .      .      .

Q  Was any pressure put on him to sign the paper?

A  No, sir.

.      .      .      .

A  On the  .   .   .  [day of his arrest] there was no pressure put on him, he didn't want to sign it. We just marked on the sheet refused to sign and let it go at that.

(8 Tr. 146–47).

Defense counsel then cross-examined McDonald. To explore the reasons why the petitioner had not signed the waiver, defense counsel asked McDonald to read part of the form. The section read into the record shows that signing the form means the person waives his right to remain silent and is willing to make a statement. (8 Tr. 151).

After a brief re-direct of McDonald,[5] the parties rested. However, the trial judge re-opened the trial to allow the defense to introduce evidence concerning McDonald's alleged bias. Again, McDonald was asked if the petitioner had signed a waiver, and again he stated that the petitioner had refused. (9 Tr. 47).

After McDonald's testimony both sides rested. In his closing statement defense counsel discussed the petitioner's refusal to sign the waiver. The purpose of the argument was to explain the petitioner's decision not to sign—according to the attorney, by signing the form the petitioner would have surrendered his right to counsel. (9 Tr. 112). Defense counsel added, "[McDonald] wanted Juan Ramos, on Friday, at

---

4. This answer did not draw an objection from defense counsel.

5. During his re-direct the prosecutor returned to the question of whether the petitioner had signed a *Miranda* waiver; when an objection

was successfully interposed, the prosecutor disagreed in open court: "The detective I think has the right to testify that he asked the man to sign this, the man refused and it *[sic]* did not make him sign. (8 Tr. 156).

three o-clock, on his third telling of the *Miranda* warning, to sign it, made a big to do in this court because he wouldn't. He wanted you to score points against him." (9 Tr. 112). This remark was stricken, but the court overruled the prosecution's objection to defense counsel's charge that the prosecution "wanted you to take that into consideration in judging his innocence or guilt when the law—." (9 Tr. 113).

The prosecutor also adverted to the giving of rights to the petitioner:

> Just because a man signs that doesn't mean he has to give a statement. They want him to acknowledge his rights were received. He doesn't have to sign it. Nobody forced him to sign it and they wrote refused to sign. Nobody tried to forge his signature or force him to sign it. He doesn't want to sign it, they wrote that in there. But it shows he's not telling the truth. . . . [I]f he doesn't want to give a statement, he has that right, a perfect right. Nobody forced him to sign those forms.

(9 Tr. 156–57).

The petitioner strenuously contends that his rights under the fourteenth amendment were violated because of the role played in the trial by the testimony about the *Miranda* waiver. Although he also claims the handling of that issue unconstitutionally impaired his right to counsel and that prosecutorial misconduct infringed his right to a fair trial, his principal contention is that his right to remain silent was violated. In particular, he relies on *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).[6] Respondent contends that *Doyle* is inapplicable; alternatively, if *Doyle* applies, any error was harmless.

As framed by the Supreme Court, the issue in *Doyle* was "whether a state prosecutor may seek to impeach a defendant's

exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." *Id.* at 611, 96 S.Ct. at 2241 (footnote omitted). Doyle and Wood had been arrested for selling 10 pounds of marijuana to an informant. At trial they contended they had been framed. To undermine that explanation, the prosecutor asked Doyle and his codefendant why they had not told that story when arrested. *Id.* at 613, 96 S.Ct. at 2242. Pleading necessity, the State asserted it had to ask those questions so that the jury could have all relevant information concerning the defendants' exculpatory story. *Id.* at 617, 96 S.Ct. at 2244. The Court, despite recognizing the importance of cross-examination, disagreed.

> Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. (citation omitted). Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 617–18, 96 S.Ct. at 2244–45 (footnotes omitted).

The Court derived some support from its decision the year before in *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). Without reaching the constitutional question, the Court in *Hale* exercised its supervisory powers to exclude post-ar-

---

**6.** Despite affirming the conviction, the Appellate Division called the prosecution's conduct "reprehensible." "We are satisfied further that each of those matters was deliberately introduced into the trial by the assistant prosecutor in an intentional effort to blacken the character of the defendant and thus to influence the members of the jury against him." The Appel-

late Division, however, did not find the prosecutor's conduct to have implicated the petitioner's constitutional rights. Moreover, the court stated that "in light of the overwhelming evidence of the guilt of the defendant," the prosecutor's misconduct had not injured the petitioner.

rest silence from use in federal trials for impeachment purposes. Justice Marshall wrote, "Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted." *Id.* at 180, 95 S.Ct. at 2138.[7]

Respondent contends *Doyle* is not controlling. Respondent's basis for distinguishing *Doyle* is not entirely clear. At one point in his brief, respondent asserts that the petitioner "was not silent at all." Answer at p. 6. This is difficult to understand. After receiving the *Miranda* warnings, the petitioner maintained his silence: as did Doyle and Wood, he declined to make any statement at all.

■ Respondent also seems to argue that *Doyle* differs from the case here because in *Doyle* there was an exculpatory defense proffered by the defendants, while the petitioner simply denied his guilt. That distinction does exist, but it is trifling. The vice adhering to the use of silence to impeach occurs regardless of whether the defendant explains away seeming involvement or completely denies knowledge of the crime. Either way, ambiguous silence is used to undercut the credibility of a defendant who chose not to speak and who was told he had a right to be silent. In one case, the defendant did not try to exculpate himself by presenting an alternate explanation to the police for his apparent culpability. In the other, the defendant simply remained silent after being arrested, instead of attesting to his innocence. Either way, the constitutional right not to incriminate oneself can-

not be turned to the disadvantage of the accused by allowing the prosecution to suggest silence is inconsistent with the defense at trial. Post-arrest silence, which is "insolubly ambiguous," is no more useful in evaluating credibility when the defendant flatly denies guilt than when he insists he was framed. Therefore, if respondent is contending that *Doyle* does not apply because *Doyle* did not involve a protestation of complete innocence, but an explanation for conceded involvement, that distinction must be rejected. Due process disregards such fine distinctions. The type of exculpatory testimony is irrelevant.

■ What matters is that the petitioner's silence is used against him. Contrary to the respondent's position, there can be no doubt that error took place, when petitioner's right not to speak was turned against him. As the court of appeals of this circuit has recently pointed out, "[I]t is fundamentally unfair for the prosecution to impose a penalty at trial on a defendant who has exercised that right by choosing to remain silent." *United States v. Agee,* 597 F.2d 350, 355 (3d Cir. 1979) (en banc). This unfairness stems "from the assurance implicit in *Miranda* warnings that the arrestee would not be penalized if he exercised his right to remain silent." *Id.* at 355 n. 17. Yet the petitioner was penalized by heeding the *Miranda* warnings and saying nothing: the prosecution used the petitioner's silence against him.

■ The line of questioning employed by the prosecution was one forbidden to it. The testimony obtained from McDonald did not aid the jury in measuring the petitioner's credibility.[8] Rather, the prosecution

---

7. In a short concurrence in *Hale,* quoted by the majority in *Doyle,* Justice White commented, "[I]t seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony." 422 U.S. at 182–83, 95 S.Ct. at 2139 (citation omitted).

8. As noted above, the explanation tendered by the prosecution for introducing the testimony that the petitioner remained silent was that it had probative value in testing the petitioner's credibility. The petitioner had testified that he was given no *Miranda* warnings. To rebut that claim—and thereby cast doubt on the petitioner's credibility—the prosecution introduced evidence that the petitioner had, in fact, been given *Miranda* warnings. But the prosecution went further than merely to contradict the petitioner on that one point: it repeatedly elicited

deliberately put before the jury evidence that the petitioner remained silent. "The natural tendency of the use of the testimony in this manner is to prejudice the defendant by attempting to create an inference of guilt in the jury's mind. . . . In the present case, there were no statements given by appellant to [the police officer] and the testimony elicited could in no way be used for impeachment purposes. This line of questioning stressing the appellant's assertion of his constitutional rights only 'cuts down on the privilege by making its assertion costly.'" *United States v. Wycoff,* 545 F.2d 679, 681, 682 (9th Cir.), *cert. denied,* 429 U.S. 1105, 97 S.Ct. 1135, 51 L.Ed.2d 556 (1977), quoting *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Constitutional error occurred, for due process denies to the prosecution the right to use a defendant's silence as a weapon. *Doyle v. Ohio, supra; Bradford v. Stone,* 594 F.2d 1294, 1295 (9th Cir. 1979) (per curiam); *United States v. Hood,* 593 F.2d 293, 297 (8th Cir. 1979); *United States v. Johnson,* 558 F.2d 1225 (5th Cir. 1977); *United States v. Williams,* 181 U.S.App. D.C. 188, 190, 556 F.2d 65, 67 (D.C.Cir. 1977)

(per curiam), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977) ("A prosecutor has no right to introduce evidence that defendant was silent"); *United States v. Impson,* 531 F.2d 274, 277 (5th Cir. 1976), *cert. denied,* 434 U.S. 1050, 98 S.Ct. 900, 54 L.Ed.2d 803 (1978) ("Doubt should not be cast upon his credibility as a penalty for exercising his prerogative to make no statement to the arresting officer").[9] In the context of impeaching the petitioner, the State introduced evidence of the petitioner's silence. That act deprived the petitioner of his constitutional right to a fair trial.

■ Now, it is clear even after *Doyle* that under certain circumstances cross-examiners may inquire into the petitioner's post-arrest silence. *See* 426 U.S. at 619 n. 11, 96 S.Ct. at 2245. The example given by the Court concerns a defendant who testifies to an exculpatory version of events and seeks to support his claim of innocence by saying he told the same tale to the arresting officers. That situation does not apply here. Other situations may also make permissible questioning the defendant about

testimony from McDonald that the petitioner had refused to sign the waiver. This testimony, combined with the *Miranda* waiver forms which were marked into evidence, told the jury that the petitioner had chosen to remain silent. That the petitioner had elected to stand mute had no bearing on the very narrow credibility issue the prosecutor purportedly wanted to explore. And, even assuming this evidence had some slight bearing on credibility, it should not have been admitted—the infusion of unfairness into the trial far outweighed whatever minimal probative value the testimony had. McDonald contradicted the petitioner when he said the warnings had been given, thereby putting the credibility question squarely before the jury. ˙Additionally, even accepting the prosecutor's theory that testimony regarding the failure to sign the waiver bears on credibility by reinforcing McDonald's version of the events, error took place. The jury was left free to take that information and use it to question the petitioner's denials of guilt. That is, rather than use the testimony solely as it bore on the petitioner's general credibility, the jury could have done what the rule in *Doyle* was designed to prevent: take the evidence of silence at the time of arrest as evidence that petitioner's story at trial was untrue because he did proclaim his innocence once arrested. Therefore, even

assuming that the prosecutor's multiple questions on the petitioner's declining to waive his rights actually had some connection with the petitioner's credibility, there can be no assurances that the jury did not treat the petitioner's silence when arrested as incompatible with later assertions of innocence.

**9.** The defense attorney did not object to McDonald's testimony. This failure to interpose a timely objection could, perhaps, be grounds for barring federal review of the claim. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The respondent, however, does not now urge that consideration of the claim is precluded because of failure to object, and the State, in the state court proceedings, also bypassed that argument. Moreover, the Appellate Division treated the issue on its merits. Under these circumstances, it is appropriate for the court to reach the federal constitutional issue. *See Bradford v. Stone,* 594 F.2d 1294, 1296 n. 2 (9th Cir. 1979); *Lussier v. Gunter,* 552 F.2d 385, 388 (1st Cir.), *cert. denied,* 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 124 (1977). *Compare Lewis v. Cardwell,* —— F.2d —— (9th Cir. 1979) (state argued that issue should not be considered because no objection entered).

silence after receipt of *Miranda* warnings. *See, e. g., United States v. Mavrick,* 601 F.2d 921, 932–34 (7th Cir. 1979) (government correcting impression created by defendant's testimony on direct); *United States v. Agee,* 597 F.2d 350 (3d Cir. 1979) (defendant not truly silent after receiving warnings). These exceptions, though, are all inapposite. The prosecution did not use the petitioner's silence in an acceptable fashion. *See* n. 8, *supra.*

Instead, a different line of cases applies, which only emphasizes the egregious nature of the prosecution's misconduct. In *Agnello v. United States,* 269 U.S. 20, 35, 46 S.Ct. 4, 70 L.Ed. 145 (1925), the Supreme Court held that suppressed evidence could not be used to impeach a defendant's credibility when the issue on which impeachment was sought arose during cross-examination. This is to be distinguished from cases where suppressed evidence is offered to impeach testimony offered on direct examination. *E. g., Walder v. United States,* 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503 (1954). Thus, the following rule has been created: suppressed evidence may be used for impeachment purposes only if it relates to a subject raised during the direct testimony of the defendant. *United States v. Hickey,* 596 F.2d 1082, 1088 (1st Cir. 1979); *United States v. Havens,* 592 F.2d 848, 851 (5th Cir. 1979) ("The predicate for its use in impeachment must be found in the direct examination of the defendant. It cannot be smuggled into evidence by the prosecutor on cross-examination"); *United States v. Whitson,* 587 F.2d 948, 951–52 (9th Cir. 1978); *United States v. Mariani,* 539 F.2d 915, 923–24 (2d Cir. 1976); *Rothschild v. New York,* 388 F.Supp. 1346, 1349 (S.D.N.Y.), *aff'd,* 525 F.2d 686 (2d Cir. 1975) (per curiam). *See* Fed.R.Evid. 608(b).

Because these cases involve the use of suppressed evidence, rather than a defendant's silence, they are not controlling. They point out, though, that courts cannot tolerate use by the prosecution of collateral matter to impeach a defendant's credibility when it was the prosecution that raised the subject in the first place.

> To allow the district attorney to impeach testimony which he himself had elicited for the first time in the same cross-examination is to allow the state to build a case against the defendant's credibility by bootstrapping. This is clearly not permissible.

*Rothschild v. New York, supra,* 388 F.Supp. at 1349 (citations omitted).[10]

Respondent's fallback position is that even if error took place, it was harmless. Like virtually all other courts, the court of appeals for the third circuit has concluded that a violation of *Doyle* does not necessarily require a new trial: a new trial need be held "if there is no 'reasonable possibility that the improperly admitted evidence contributed to the conviction . . . .'" *United States v. Agee, supra,* 597 F.2d at 359 n. 29, quoting *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972). *See United States v. Meneses-Davila,* 580 F.2d 888, 893 (5th Cir. 1978); *Chapman v. United States,* 547 F.2d 1240, 1249–50 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977); *United States v. Wyckoff, supra.*

■ The court has carefully considered respondent's position that the error was harmless. However, there is a reasonable possibility that the repeated references to the petitioner's silence contributed to his conviction.

Veracity held the key to the petitioner's acquittal. Pitted against the petitioner's denials of guilt was the testimony of two perpetrators of the crime, both of whom could be viewed as having a substantial personal interest in securing the petitioner's conviction. If believed, the petitioner wins; if disbelieved, he loses. Thrown into what might have otherwise been a nearly balanced equation was testimony that the peti-

---

**10.** This doctrine, with its constitutional overtones, is different from the rule of evidence that should have operated to preclude McDonald's testimony: extrinsic evidence of collateral facts cannot be used to impeach a witness. *See* McCormick on Evidence 98 (2d ed. 1972). *See also* Fed.R.Evid. 608(b).

tioner had been silent when questioned. The jury could have used that information as substantive evidence of the petitioner's guilt, or it could have used the testimony to discredit the petitioner's avowals of innocence—for the testimony came into the trial as a collateral attack on the petitioner's credibility—thereby sealing a finding of guilt. Of course, the jury might have disregarded the testimony altogether, or convicted even in its absence. There is no way of knowing what effect the testimony had. The only certainty is that the jury could use the testimony of McDonald in any way it felt proper, for no limiting instructions were given at any point during the trial. Given the nature of the case, where the comparative credibility of Mobley, Burr and Ramos was decisive; the absence of guidance to the jury; the large number of times the jury heard the petitioner had been silent; and the egregious nature of the violation of the petitioner's rights under *Doyle,* it cannot be said that the error was harmless. *See United States v. Meneses-Davila, supra,* 580 F.2d at 893; *Minor v. Black,* 527 F.2d 1, 5–6 (6th Cir. 1975), *cert. denied,* 427 U.S. 904, 96 S.Ct. 3198, 49 L.Ed.2d 1198 (1976). *Cf. United States v. Williams,* 484 F.2d 428, 432 (8th Cir. 1973) (improper impeachment of defendant not harmless error when direct conflict between his testimony and that of key government witness); *United States v. Pennix,* 313 F.2d 524, 531 (4th Cir. 1963) (improper cross-examination not harmless error where sharp issue of credibility determination for jury; testimony of defendant versus two self-confessed bank robbers); *State v. Koch,* 118 N.J.Super. 421, 433–34, 288 A.2d 295 (App.Div. 1972).

The writ will issue at the end of ninety days from entry of an order hereon, unless the State sooner retries the petitioner.