**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Miguel MORALES–QUINONES, Defendant-Appellant.**

**No. 85–2048.**

United States Court of Appeals, Tenth Circuit.

Feb. 20, 1987.

**606**

Tova Indritz, Federal Public Defender, Albuquerque, N.M., for defendant-appellant.

Jennifer A. Salisbury, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., Albuquerque, N.M., was on brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, LOGAN and SEYMOUR, Circuit Judges.

HOLLOWAY, Chief Judge.

A federal grand jury indicted the defendant Miguel Morales-Quinones and a codefendant Manuel Saenz-Garcia on four counts of transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2) [1] and 18 U.S.C. § 2. The four counts of the indictment were virtually identical except for the name of the aliens alleged to have been transported into the United States unlawfully. The aliens named as persons transported were as follows: Count I—Gregorio Ruiz-Botello; Count II—Maria del Carmen Botello-Morales; Count III—Jose Guadalupe Espino-Rios; and Count IV—Jose Marcos Gonzales-Saucedo.

After two days of trial the jury returned verdicts finding the defendant and his codefendant Saenz-Garcia guilty on all four counts.[2] On appeal, the defendant asserts that the district court committed seven errors which call for reversal of his convictions.[3] After a review of the principal facts, we will address each of those issues.

**I**

The case began with a long distance telephone call placed on March 13, 1985, by a

---

1. 8 U.S.C. § 1324(a)(2) provides:

 **(a) Persons liable**

 Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

 . . . . .

 (2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

 . . . . .

 any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: Provided, however, That for the purposes of this section, employment (including usual and normal practices incident to employment) shall not be deemed to constitute harboring.

2. The district court sentenced defendant Morales-Quinones to five years' imprisonment on Counts I through III, each sentence to run concurrently. The court suspended the imposition of sentence on Count IV and placed the defendant on probation for three years which was to run consecutively to the sentences imposed for Counts I through III. A special penalty of $50.00 was also assessed on each of the four counts.

3. The codefendant Saenz-Garcia has abandoned his appeal.

Government informant, Julia Botello-Hernandez, from Juarez, Chihuahua, Mexico, to Immigration and Naturalization Service (INS) Agent Henry C. Murphy in Albuquerque, New Mexico. She told Murphy that she and several members of her family were in Juarez and wanted to come to the United States. She told Agent Murphy that she had contacted a smuggler willing to transport them from Juarez to Albuquerque. She asked Murphy if he would pay the smuggler money to transport them. Murphy agreed.

Some two years earlier, Agent Murphy had given his telephone number to Julia's brother Manuel Botello, asking Manuel to call him if he ever was going to be transported into the United States. Manuel agreed.

Prior to Julia's call to Murphy, Manuel called Agent Murphy telling him that his sister was attempting to enter the United States and would call Murphy if she made contact with someone who could transport her. When Julia did call, Agent Murphy agreed to pay for the transportation to Albuquerque. The arrangement essentially was that Julia and her companions would get free transportation, identify the smugglers, work here a few months, and then voluntarily depart after the trial of the smugglers.

Later the same day that Julia called Agent Murphy, she and her son Gregorio Ruiz-Botello, her niece Maria del Carmen Botello-Morales, and a cousin of a cousin Jose Guadalupe Espino-Rios, met the codefendant Saenz-Garcia in Juarez and made arrangements to be transported from Juarez to Albuquerque. None of the aliens had documents which would allow them to legally enter the United States. The four aliens agreed to pay a total of $350 each. Julia and Jose Guadalupe Espino-Rios each paid the codefendant Saenz-Garcia $50 as a downpayment.

Jose Marcos Gonzales-Saucedo, a Mexican citizen, was also in Juarez on March 13, 1985, and made arrangements with the codefendant Saenz-Garcia to be unlawfully transported into the United States. Gonzales-Saucedo did not have documents which would permit him to enter the United States lawfully. He paid a $100 downpayment to the codefendant Saenz-Garcia.

On the evening of March 14 the codefendant Saenz-Garcia guided the Botello-Hernandez family, Espino-Rios, and Gonzales-Saucedo to the Rio Grande River. While still in Mexico before crossing the river, four of the aliens testified that they met the defendant. II R. 58–61, 98, 125–26, 162. The aliens further testified that the defendant asked them for the remaining amount of the money owed for the trip, but they refused to pay him. *Id.* at 58, 98–99, 125–26, 162.

The codefendant Saenz-Garcia guided the group of aliens across the river and into the United States. The defendant did not wade across the river with the group, but drove his car across a nearby bridge into the United States. The codefendant Saenz-Garcia then led them to a brown station wagon. The aliens packed into the station wagon with the codefendant Saenz-Garcia driving. The codefendant drove the entire trip to Albuquerque, while the defendant led the way in a separate blue small car. II R. 60, 128.

The group arrived in Albuquerque on March 15. On arrival Julia Botello-Hernandez gave the defendant Agent Murphy's phone number. The defendant called Murphy, identifyng himself as Miguel Morales and asking Murphy for the $950 payment. The defendant stated that he could be found at the Regal Inn parking lot. Murphy responded that it would take some time to get the money but to wait for him at the lot. The telephone conversation was taped and admitted into evidence along with a transcription as Government Exhibit Nos. 2 and 5.

After the telephone conversation Murphy directed INS Agent Mario Salinas to go to the Regal Inn parking lot in a surveillance van and set up a video camera. III R. 205. Shortly after the video camera was set up, Agent Murphy arrived at the Regal Inn parking lot. Murphy observed a station wagon full of people and a blue and white AMC Gremlin with one occupant. *Id.* at 225. Murphy approached the station wag-

on. The codefendant Saenz-Garcia got out of the driver's seat of the station wagon. Simultaneously the defendant got out of the Gremlin.

A conversation ensued between Murphy and the defendant. The conversation was recorded by a video camera and a tape recorder planted on Agent Murphy. The video cassette was entered into evidence as Government Exhibit No. 1. The audio tape and the transcription of the audio tape were also admitted into evidence as Government Exhibit Nos. 3 and 6. A copy of the audio tape transcript is included in the Appendix to this opinion.

During the recorded conversation, Agent Murphy asked why the group was a day late. The defendant responded that he had to repair the car while on the road the day before. Murphy asked if they had any trouble crossing the river. The defendant responded no. Murphy asked how much he owed the defendant. The defendant responded $950 since the aliens had already paid him $100. Murphy said that he had only $500 in cash and asked if he could make a check out for the remainder. The defendant responded that a check would be fine and that it should be made out to Miguel Morales of Longmont.

Thereupon the defendant and the codefendant Saenz-Garcia were arrested. The aliens in the station wagon were also arrested, but their cases were handled administratively as proceedings against illegal aliens. Agent Murphy arranged six-month stays in the United States for Botello-Hernandez, Botello-Morales, Ruiz-Botello, Espino-Ruiz, and Gonzales-Saucedo, on the condition that they testify at trial and voluntarily return to Mexico at the end of six months. Three Mexican alien men who were also occupants of the station wagon voluntarily departed and returned to Mexico.

The defendant did not testify at trial but relied on the codefendant's testimony that the defendant was not in Mexico. He also utilized his counsel's cross-examination and his theory that he did not see the aliens until he came on them in Albuquerque having car trouble. The video did show the station wagon hood up at the parking lot and the codefendant putting new oil in the vehicle.

## II.

### THE DEPARTURE OF EYEWITNESS DE LA HOYA–MEDRANO

The defendant contends that the district court erred in failing to dismiss the indictment because the Government gave one of the illegal aliens, Manuel de la Hoya-Medrano, immediate voluntary departure when that material witness stated to INS agents that he did not see the defendant in Mexico, in El Paso, during the trip from El Paso to Alburquerque, or in Alburquerque. I R. 5; III R. 285. The Government granted voluntary departure before the defendant's counsel had an opportunity to interview or subpoena the witness. The district court denied the motion to dismiss the indictment finding "that the Motion is not well taken...." I R. 30.

The seminal Supreme Court decision on the deportation of an alien eyewitness is *United States v. Valenzuela-Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). There the Court found that "the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien eyewitnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution." *Id.* at 872, 102 S.Ct at 3449. The Court stated the standard for determining whether the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment has been violated: "A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense." *Id.* at 873, 102 S.Ct. at 3449. *See also United States v. Saintil,* 753 F.2d 984, 987 (11th Cir.1985); *United States v. Schaefer,* 709 F.2d 1383, 1385–86 (11th Cir.1983).

■ At the outset we must determine whether the facilitation of a voluntary departure is equivalent to deportation in these circumstances. We note that the Sixth Circuit had no problem reaching the

conclusion that the two are congruous for these purposes. *United States v. McLernon*, 746 F.2d 1098, 1121 (6th Cir.1984). We further note that the Government's brief before us assumes that the standard articulated in *Valenzuela-Bernal* applies here where the Government facilitated a voluntary departure. We conclude that the Government's facilitation of the voluntary departure here was equivalent to deportation.

■ We now must decide whether the defendant here made a plausible showing that de la Hoya-Medrano's testimony would have been both material and favorable to the defense. De la Hoya-Medrano stated to an INS agent that he did not see the defendant during the trip, in Mexico, El Paso, or in Alburquerque. III R. 285. The theory of the defense was that the defendant did not travel to Mexico, to Texas, or to any other point south of Albuquerque. We note that in *Valenzuela-Bernal* the Court warned that "[b]ecause prompt deportation deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess ... the defendant cannot be expected to render a detailed description of their lost testimony." 458 U.S. at 873, 102 S.Ct. at 3449. We must agree that the eyewitness alien's testimony that he did not see the defendant at any such times was both material and favorable to the defendant's theory that he never travelled south of Albuquerque.

We further conclude that the potential testimony was not merely cumulative to that of available witnesses. *See Valenzuela-Bernal*, 458 U.S. at 873, 102 S.Ct. at 3449. Although the codefendant Saenz-Garcia did testify that he had never seen the defendant before they met in Albuquerque at the Regal Inn parking lot, we cannot say that de la Hoya-Medrano's testimony that he did not see the defendant at any point during the trip was merely cumulative. The testimony of another and unindicted eyewitness is of a different nature than that of a codefendant.

However, after determining that the absent witness' testimony was both material and favorable to the defense and not merely cumulative to the testimony of available witnesses, we must resolve the question whether "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." 458 U.S. 874, 102 S.Ct. at 3450 (citation omitted). If the evidence of the defendant's guilt posed a close question, the Government's action might require reversal. However, the evidence of the defendant's guilt here is manifestly overwhelming. At least four eyewitnesses testified that they encountered the defendant on the Mexican side of the Rio Grande. Several eyewitnesses testified that he demanded payment before they crossed the river. Several eyewitnesses testified that the defendant drove a small blue car leading the station wagon into Albuquerque. The video tape and the audio tape of INS Agent Murphy's conversation with the defendant is vividly incriminating, including defendant's statement that he had fixed the car the day *before* their arrival, that Murphy owed him $950, and that Murphy should make the check out to "Miguel Morales." *See* Appendix.

We conclude that with such overpowering evidence of the defendant's guilt, there is no reasonable likelihood that the testimony of the eyewitness Hoya-Medrano could have affected the judgment of the trier of fact. Thus, the district court correctly denied the motion to dismiss the indictment.

### III

### THE ADMISSION OF HEARSAY STATEMENTS BY OTHER PERSONS TRAVELLING WITH THE GROUP

Over defense hearsay objections, the trial judge admitted testimony by Agent Murphy repeating statements made by Espino-Rios that the defendant was in Juarez and similar statements made by two other persons travelling from Mexico with the group, but who voluntarily departed before trial.[4] The judge's basis for his ruling was that defense counsel had "opened the door" to such testimony by inquiring about the

---

**4.** Espino-Rios, named as the alien unlawfully transported in Count III, was given a six-month voluntary departure but did not appear at the trial. His whereabouts were unknown.

statements made by the missing witness, Hoya-Medrano, before he was permitted to depart voluntarily for Mexico. The defendant argues on appeal that the court's ruling violated both the Confrontation Clause and the hearsay rule.

The testimony was apparently admitted under the doctrine of curative admissibility, which is limited to the prevention of prejudice and used "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence ..." *United States v. Winston*, 447 F.2d 1236, 1240 (D.C.Cir. 1971). (citation omitted). *See Whiteley v. OKC Corp.*, 719 F.2d 1051, 1055 (10th Cir. 1983) (opposite party permitted to introduce evidence on same "field of inquiry" as adversary introduced, although subject usually inadmissible); *United States v. Regents of New Mexico School of Mines*, 185 F.2d 389, 391–92 (10th Cir.1950). It is a doctrine "dangerously prone to overuse." *United States v. McClain*, 440 F.2d 241, 244 (D.C. Cir.1971). Since de la Hoya-Medrano's early departure, permitted by the Government, raised serious questions under the deported witness law discussed in Part II, it is plausibly arguable that the admission of his statements did not produce "unfair prejudice" justifying the admission of other absent witnesses' statements offered by the Government. The Government had the testimony of other witnesses to establish the disputed point—defendant's presence in Juarez.

█ We need not decide this point, however, because as related earlier the defendant's involvement in the operation throughout was proved by overwhelming evidence from other witnesses and his own statements. Any error in the ruling was thus harmless beyond a reasonable doubt. *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969).

## IV

### THE CLAIM OF OUTRAGEOUS GOVERNMENTAL MISCONDUCT

█ The defendant says that outrageous Government misconduct requires the reversal of the Count I and II convictions. INS Agent Murphy gave Julia Botello's brother his phone number two years earlier and suggested a call to Murphy if he needed transportation to Albuquerque. Julia used this number to call Murphy, given to her by her brother. She wanted Murphy to confirm with her smuggler that her fees would be paid to him when she got to Albuquerque, and Murphy agreed and confirmed this when an unknown male called Murphy. Defendant maintains these actions amounted to such outrageous Governmental misconduct that prosecution was barred by the Due Process Clause, *see United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *Hampton v. United States*, 425 U.S. 484, 492 n. 2, 96 S.Ct. 1646, 1651 n. 2, 48 L.Ed.2d 113 (1976) (Powell, J., concurring, joined by Blackmun, J.), relying particularly on *United States v. Valdovinos-Valdovinos*, 588 F.Supp. 551 (N.D.Cal.), *rev'd on other grounds*, 743 F.2d 1436 (9th Cir. 1984), *cert. denied*, 469 U.S. 1114, 105 S.Ct. 799, 83 L.Ed.2d 791 (1985).

We are not persuaded by the *Valdovinos* opinion. There was some difference and an element not present here—the INS agents told the aliens that they were prospective employers. We are not convinced that the conduct here reached a demonstrable level of outrageousness requiring reversal on due process grounds. *See United States v. Gamble*, 737 F.2d 853 (10th Cir.1984); *United States v. Biswell*, 700 F.2d 1310 (10th Cir.1983); *United States v. Szycher*, 585 F.2d 443, 449 (10th Cir.1978).

## V

### SUFFICIENCY OF THE EVIDENCE ON THE COUNT III CONVICTION

The defendant challenges the sufficiency of the evidence that Jose Guadaloupe Espino-Rios was an alien.[5] He points out that Julia was asked what country Espino-Rios was a citizen of and merely replied, "From

**5.** *See* footnote 4.

the State of Durango." This was incompetent, he says, because Julia had only met Espino-Rios the day before and her familiarity with the matter of reputation as to birth, marriage, and the like was not sufficiently shown, Fed.R.Evid. 803(19), and that if such information came from Espino-Rios himself, his unavailability at trial was not shown as required by Fed.R.Evid. 804(b)(4). Thus, this evidence fails, and the remainder was insufficient.

■ We disagree. No objection was made when Julia's testimony was offered on this point and thus the specific ground of such objection was not stated at trial as required by Fed.R.Evid. 103(a)(1) to premise an appellate claim of error.[6] II R. 54. Julia's testimony was also supported by circumstantial evidence—Espino paid $50.00 to the codefendant to be transported into this country, he waded across the river at night with other aliens, and he was given a permit to remain in the United States not more than six months. We hold the evidence clearly sufficient to support the conviction of guilt beyond a reasonable doubt as to Count III.

## VI

### ADMISSION OF DEFENDANT'S PRIOR CONVICTION

The defendant argues that the court erred when it allowed the prosecution to introduce evidence of his prior conviction for transporting an illegal alien as well as the facts and circumstances leading to his arrest in connection with that prior conviction when he did not testify.

Prior to trial the Government gave notice that it would attempt to offer evidence of the defendant's plea of guilty to one count of transporting an illegal alien in violation of 8 U.S.C. § 1324(a)(2), pursuant to Fed.R. Evid. 404(b). The conviction was to be introduced for the purpose of establishing knowledge or absence of mistake in an effort to rebut defendant's expected defense that he was not involved in the offense, but instead was assisting the aliens translate from Spanish to English. II R. 31–32. The defendant filed a motion *in limine* for exclusion of the conviction. The court expressed doubt about the Government's position for admission of the evidence but reserved the ruling until the evidence was offered. II R. 33.

The court then allowed introduction of the evidence in the Government's case-in-chief on the basis that it was admissible "for purposes other than showing guilt of this offense; suich [sic] as proof of motive, opportunity, intent, knowledge or absence of mistake or accident." II R. 181. The court found that its probative value was not outweighed by any prejudice it might cause under Rule 403. *Id.* The jury was instructed at the conclusion of the trial that it could infer from this conviction that defendant acted knowingly and not because of mistake or accident or other innocent reason in doing the act charged in the indictment. III R. 385–86.

Rule 404(b) provides that:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may

6. Defendant argues that the Government is saying that the defense invited any error in the admission of this evidence by Julia's testimony by failing to object; that in reality, the Government had led defendant's counsel to believe that Espino-Rios would testify; and that in such event objection would have been a fruitless gesture so that the error was not invited. The defendant also vigorously argues that the admission of Julia's testimony concerning Espino-Rios' alienage was plain error. (Defendant's Reply Brief 14–15).

We do not read the Government's brief as discussing "invited error." It states that defendant neglected to make an objection when the testimony was offered and thus the issue was not properly preserved for appeal, citing Fed.R. Evid. 103. (Brief of Appellee 27). As stated in the text, we agree with this proposition. Regardless of any impression that Espino-Rios would testify, the defendant should have made the proper objection when the testimony was offered through Julia, and this would have preserved the objection; if Espino-Rios' testimony had been required, he would have been subject to cross-examination by the defendant's counsel. We likewise disagree with defendant's argument that the admission of the testimony of Julia was plain error so that defendant may now argue for reversal on this point without having made the objection at trial.

however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

 Before such evidence is admissible, it (1) must tend to establish intent, knowledge, motive, identity, or absence of mistake or accident; (2) must also be so related to the charge that it serves to establish intent, knowledge, motive, identity, or absence of mistake or accident; (3) must have real probative value, not just possible worth; and (4) must be close in time to the crime charged. *United States v. Kendall,* 766 F.2d 1426, 1436 (10th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). Moreover, the trial court must specifically identify the purpose for which such evidence is offered; a broad statement merely invoking or restating Rule 404(b) will not suffice. *Id.* A specific articulation of the relevant purpose and specific inferences to be drawn from each proffer of evidence of other acts enables the trial court to more accurately make an informed decision and weigh the probative value of such evidence against the risks of prejudice specified in Rule 403, and, in addition, greatly aids an appellate court in its review of those evidentiary issues. *Id.* at 1436–37. If such evidence is admitted the ruling will not be reversed absent an abuse of discretion by the trial judge. *United States v. Nolan,* 551 F.2d 266, 271 (10th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977).

The trial judge's statement was somewhat general in terms, but he did refer to the need for the evidence on the basis of the opening statements that defendant had not been south of Albuquerque and that he was merely in Albuquerque at the time. II R. 181. Defense counsel had told the jury

in her opening statement that he came from his Colorado home to Albuquerque to see an old friend, that he had stopped to try to call his friend, that a man asked for help because of car trouble, that this man said he was waiting for someone to deliver some money to him, that defendant fell asleep until called out of his car, and that he then had a conversation with a man who turned out to be Agent Murphy. II R. 48–49.

 We find no error in the ruling in admitting the conviction and testimony about the defendant's underlying actions. The evidence was admissible to show absence of mistake or accident in defendant's actions during the transactions, *see United States v. Winn,* 767 F.2d 527, 529–30 (9th Cir.1985); *United States v. Longoria,* 624 F.2d 66, 68–69 (9th Cir.), *cert. denied,* 449 U.S. 858, 101 S.Ct. 158, 66 L.Ed.2d 73 (1980); *United States v. Herrera-Medina,* 609 F.2d 376, 379–80 (9th Cir.1979), and the jury was given a proper instruction in the closing charge on the permissible inference that the defendant acted knowingly and not because of mistake or accident or other innocent reason. III R. 386.

## VII

### GOVERNMENT WITNESS' COMMENT ON DEFENDANT'S REFUSAL TO WAIVE MIRANDA RIGHTS

The defendant further contends that the court erred in refusing to grant the defendant's motion for a mistrial after Agent Murphy testified before the jury that defendant, after being read his *Miranda* rights at the immigration office, refused to sign the waiver found on the back of the *Miranda* form.[7]

---

**7.** The colloquy which occurred was as follows:
[Prosecutor] Q: What happened after you arrived at your office?
[INS Agent] A: When we arrived at the office, both of the defendants were advised again of their Miranda Warnings from a form that we have, which has the Miranda Warning written on it. It also has a waiver. Mr. Morales refused to sign the waiver—

[Defendant's Attorney] MS. INDRITZ: Excuse me. May we approach the bench, Your Honor?
III R. 244. A sidebar conference was then held and defendant's attorney, Ms. Indritz moved for a mistrial. This motion was denied by the court on the basis that the "only thing the witness said is that he [defendant] refused to sign a waiver."

A State prosecutor's use of silence of a defendant at the time of arrest and after receiving *Miranda* warnings has been held to be a violation of the Fourteenth Amendment Due Process Clause. *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). "Crafty questioning may constitute 'comment' despite its obliquity." *United States v. Helina,* 549 F.2d 713, 718 (9th Cir.1977); *see Johnson v. Patterson,* 475 F.2d 1066, 1068 (10th Cir.), *cert. denied,* 414 U.S. 878, 94 S.Ct. 64, 38 L.Ed.2d 124 (1973). The admission of the fact that an accused refused to waive his Fifth Amendment rights is improper. *Ramos v. Seidl,* 479 F.Supp. 771, 777–78 (D.N.J.1979). The test for determining if there has been an impermissible comment on a defendant's right to remain silent at the time of his arrest is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment" on the defendant's right to remain silent. *United States v. Barton,* 731 F.2d 669, 675 (10th Cir.1984). The court must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact on the jury. *United States v. Vera,* 701 F.2d 1349, 1362 (11th Cir.1983).

Assuming, *arguendo,* that there was a technical violation of the defendant's Fifth Amendment rights, the reference to his refusal to sign the waiver was so minimal and brief that we do not feel that the language was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent. The statement from the witness cannot be said to have been elicited by the prosecutor. Nor did the prosecutor attempt to emphasize or use the testimony of the INS Agent to infer defendant's consciousness of guilt at that time or at a later time in the trial. *See United States v. Griffith,* 756 F.2d 1244, 1252–53 (6th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985). Defendant's attorney did not request an instruction to disregard the testimony, and we do not feel that the judge was obliged to give one. In sum, we do not feel there was error in denial of the motion for a mistrial.[8]

## VIII

## CROSS–EXAMINATION OF GOVERNMENT WITNESS AS TO CREDIBILITY

The defendant finally contends that the trial court erred in instructing the jury not to consider the previous illegal entries of one of the Government's material witnesses, Jose Marcos Gonzalez-Saucedo, except for those entries resulting in convictions.[9]

Where the testimony of a witness is critical to the Government's case, the defendant has a right to attack the witness' credibility by wide ranging cross-examination. *United States v. Dennis,* 625 F.2d 782, 798 (8th Cir.1980). Under Fed.R.Evid. 608(b) a defendant may impeach a Government witness by cross-examining him about specific instances of conduct not resulting in conviction if such conduct is probative of the witness' character for truthfulness or untruthfulness. Such inquiry is within the discretion of the trial court subject to Rule 403. *United States v. Girdner,* 773 F.2d 257, 261 (10th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1379, 89 L.Ed.2d 605 (1986); *United States v. Atwell,* 766 F.2d 416, 420 (10th

He then admonished the prosecutor to stay away from this subject. III R. 244–45.

8. We note however, that the incident created an obvious problem with constitutional implications. It would be a prudent safeguard for the Agents scrupulously to avoid such statements in order not to needlessly jeopardize the rights of the accused or the public's interest in the conviction of guilty parties.

9. Defendant argues the court also erred in instructing the jury not to consider the testimony of Julia Botello-Hernandez regarding her prior illegal entries. Despite this contention, we find no evidence that the court either restricted defendant's cross-examination of this witness or instructed the jury to disregard her testimony regarding past illegal entries. II R. 74–44. The court's instruction was limited to Mr. Gonzalez-Saucedo. II R. 187–88, III R. 383.

Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 251, 88 L.Ed.2d 259 (1985). Finally, cross-examination of a witness regarding specific instances of conduct which are probative to show any incentive a witness may have to falsify his testimony is also proper. *See Cloud v. Thomas,* 627 F.2d 742, 744 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1760, 68 L.Ed.2d 239 (1981); *United States v. Salsedo,* 607 F.2d 318, 321 (9th Cir.1979).

■ The court initially allowed defendant's attorney to extensively cross-examine Gonzalez-Saucedo about his numerous illegal entries into this country, I R. 143–158, some of which resulted in convictions, but later instructed the jury to ignore the testimony regarding any illegal entries which did not result in convictions. II R. 187–88; III R. 383. While the admission of testimony regarding the witness' illegal entries not resulting in convictions would have been proper under Rule 608(b), we cannot say that the trial court abused its discretion when it instructed the jury to disregard that testimony. Rule 608(b) is subject to the Rule 403 considerations. The judge in a sidebar conference indicated that he found defendant's detailed questioning of Mr. Gonzalez-Saucedo's illegal entries to be of little probative value and possibly confusing to the jury by shifting the focus from the accused to the witness. II R. 149–51. Moreover, we feel that the convictions for illegal entry admitted by the witness provided the jury with sufficient information to appraise it of any bias or motive of the witness for untruthfulness. The testimony of the illegal entries not resulting in convictions would simply have been cumulative. We find no error in the trial court's instruction limiting the jury's consideration of the witness' testimony to illegal entries resulting in convictions.

AFFIRMED.

### APPENDIX

MURPHY Yeh, I'm Mike.

SAENZ Hi Mike, (unitelligable)

MURPHY Miguel? Are you Miguel? Are you the guy I talked to on the phone? Who did I talk to on the phone? You? I'm Mike. How you doing.

MURPHY Whats your name? Miguel? I don't know you. Well, anyway. How many people?

MORALES Eight of 'em.

MURPHY Eight? But I thought only I had was Carmela, her brother and the other one.

MORALES Yeh, well the other guys, I'm taking to Colorado.

MURPHY Going to Colorado? Oh, O.K. Well. Did you have any trouble? I thought you were coming up yesterday. I waited all day yesterday for a telephone call.

MORALES No, we come last night.

MURPHY Yeah, I know, how come yesterday you didn't come.

MORALES Because we have trouble with (unintel ..)

MURPHY Oh, with the car?

MORALES Yeah, have to fix it. I fixed it yesterday.

MURPHY Did you have any trouble getting across the river or anything?

MORALES No.

MURPHY None at all? Well, I don't know if I have enough money or not.

MORALES Ah, they gave me a hundred dollars already.

MURPHY They gave you a hundred? How much do I owe you?

MORALES Nine, nine fifty.

MURPHY Nine fifty

MORALES Yeah, three each.

MURPHY Well I've got five hundred cash. Will you, can you take a check for the rest?

MORALES Yeah, thats O.K.

MURPHY Who should I make a check out to?

MORALES (unintel ...)

MURPHY Well I've got five hundred here so I need a check for four hundred and fifty.

MORALES Yeah, thats O.K.

MURPHY Who should I make it to?

MORALES Miguel Morales

MURPHY To you?

MORALES Yes

MURPHY Okay, any address or anything?

MORALES No

MURPHY It's cold

MURPHY Yeah, (unintel ...)

MURPHY In Longmont?

MORALES Yeah, in Longmont.

MURPHY OK, well I'll tell you what, let's go ahead, were Immigration. You fellows just stand pat. Yeah, let's go. We're with Immigration. Give me your hand. Come on fellows.

MURPHY Where the hell's the Trans AM.

MURPHY That ought to be enough.