In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1894

United States of America,

Plaintiff-Appellee,

v.

Dina Abdelhaq,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 146--George W. Lindberg, Judge.


Argued January 16, 2001--Decided April 10, 2001


 Before Flaum, Chief Judge, and Posner and Coffey,
Circuit Judges.

 Posner, Circuit Judge.  The government indicted
the defendant on 17 counts of bank fraud, mail
fraud, securities fraud, and welfare fraud,
involving fraudulent conduct over a period of
less than two years by which the defendant had
obtained money from banks, insurance companies,
and state and federal welfare agencies. The
district judge ordered a number of the charges
severed, leaving for trial the counts relating to
just three incidents: the defendant's murder of
her infant daughter Tara to collect the proceeds
of a life-insurance policy that she had obtained
on the infant's life (the most lurid charge, and
the heart of the trial and the appeal), charged
as mail fraud; another insurance fraud, arising
from a slip and fall accident in which the
defendant falsely claimed to have been injured;
and a bank fraud involving the cashing of three
bad checks within a month after the daughter's
death in order to obtain money for gambling. The
severed counts included similar insurance and
bank frauds, along with welfare fraud.

 The grant of the motion to sever was
questionable. None of the usual grounds for
severance of counts at trial, Fed. R. Crim. P.
14; United States v. Coleman, 22 F.3d 126, 132-33
(7th Cir. 1994), was present. The frauds charged
in the indictment, all it appears motivated by

the defendant's desire to obtain money for gambling, were closely related in time as well as in method and motive, and might even have been charged as a single scheme. The risk that the jury would be confused or prejudiced was slight. The retained counts, which included the murder, were more lurid than the ones severed, and so it was not a case of "evidentiary spillover," that is, a case in which a strong count is added in the hope of bolstering a weak one. (Moreover, as a basis for requiring severance, "evidentiary spillover" has been rejected, e.g., United States v. Dixon, 184 F.3d 643 (7th Cir. 1999), United States v. Alexander, 135 F.3d 470, 478 (7th Cir. 1998); Sandoval v. Calderon, No. 99-99010, 2001 WL 167833, at *5-6 (9th Cir. Feb. 21, 2001); United States v. Wiseman, 172 F.3d 1196, 1211-12 (10th Cir. 1999); United States v. Chitty, 15 F.3d 159, 161 (11th Cir. 1994), in all but one case that we've found, Bean v. Calderon, 163 F.3d 1073, 1084-85 (9th Cir. 1998), where it was accepted on very dubious due process grounds.) Likewise slight was the risk that the jury would be overwhelmed by the sheer number of charges or that it would convict the defendant simply for exhibiting criminal propensities. See United States v. Vest, 116 F.3d 1179, 1189-90 (7th Cir. 1997).

The judge felt that the government didn't need the extra counts. He may have been right. There would be no sentencing increment from conviction of the other charges if the government succeeded in convicting the defendant of the main charge, that of murdering her daughter for the insurance money. And indeed, after she was convicted on that charge and sentenced to 21 years in prison, the government dismissed the counts that had been severed. But the decision on how many counts are needed to present an effective case is a managerial decision committed to the discretion of the prosecution. That was the basis on which we reversed the order of severance in United States v. Giannattasio, 979 F.2d 98 (7th Cir. 1992), remarking that "a judge in our system does not have the authority to tell prosecutors which crimes to prosecute or when to prosecute them," though we acknowledged the possibility, not presented either by Giannattasio or by this case, that "the judiciary has some inherent power to protect itself from cases of overwhelming complexity." Id. at 101.

The government, however, is not challenging the grant of the motion to sever (as it did in Giannattasio by refusing to sever, precipitating a dismissal of the indictment from which it could and did appeal), and so we take the order as a given and consider the defendant's argument that the government violated it by referring to facts

relating to the severed counts during the trial. Even if there was a violation, it would not follow that the proper sanction was reversal. With immaterial exceptions, only prejudicial errors warrant reversal; our discussion of the basis (or rather lack thereof) of the severance order in this case suggests that a violation of the order was unlikely to be prejudicial. But there is a deeper objection to the defendant's argument, and that is its premise that the effect of severance is to forbid reference to the facts underlying the severed counts. All a severance does is reduce the number of counts or the number of defendants. It is not the equivalent of a ruling granting a motion in limine to exclude specified evidence from the trial. Granted, evidence relevant only to a particular count in the indictment becomes irrelevant if the count is severed; but relevant evidence is unaffected. E.g., United States v. Arrington, 159 F.3d 1069, 1072 (7th Cir. 1998); United States v. Moore, 115 F.3d 1348, 1362 (7th Cir. 1997); United States v. Windom, 19 F.3d 1190, 1198 (7th Cir. 1994); United States v. Mackey, 117 F.3d 24, 26 (1st Cir. 1997); United States v. Pierce, 62 F.3d 818, 830 (6th Cir. 1995). When such evidence is presented, the defendant can object to its admission on any of the grounds for such an objection that the Federal Rules of Evidence allow, such as undue prejudice or one of the other grounds in Rule 403, see United States v. Mobley, 193 F.3d 492, 495-96 (7th Cir. 1999); of particular significance, of course, is Fed. R. Evid. 404(b), with its limitations on the introduction in evidence of other crimes besides the ones the defendant is being tried for. But severance is not one of those grounds. Evidence underlying a severed count but relevant to the remaining counts has the same status as any other relevant evidence. In this case that evidence, to which in any event no proper objections were made, was not only relevant, but highly probative in demonstrating the defendant's desperation for gambling money and her practice of defrauding insurance companies and other disbursers of cash in order to obtain the money she wanted for gambling or to pay her gambling debts.

The defendant's only other argument that merits discussion is that there was insufficient evidence to justify a rational jury in finding beyond a reasonable doubt that she had killed her daughter, her claim being that the infant died of SIDS (sudden infant death syndrome--"crib death," as it is sometimes called). The argument is based partly on the mistaken belief that circumstantial evidence alone cannot support a murder conviction and partly on a failure to keep steadily in mind that this is a fraud case rather than a murder case. It makes no difference whether (as in fact

the evidence demonstrates convincingly) the defendant smothered the infant or whether, hoping that it would die, so that she could collect the insurance proceeds, she failed to provide the infant with basic care. The mail-fraud statute punishes the scheme to defraud, 18 U.S.C. sec. 1341; United States v. Stockheimer, 157 F.3d 1082, 1087 (7th Cir. 1998), and there is no doubt that the defendant deliberately misled the insurance company into thinking that it was insuring an infant who would receive ordinary, rather than either lethal or deliberately inadequate, care from the mother, the beneficiary of the insurance policy on the infant's life. That was all that was necessary to enable a rational jury to find her guilty beyond a reasonable doubt. See, e.g., United States v. Gee, 226 F.3d 885, 891 (7th Cir. 2000); United States v. Cheska, 202 F.3d 947, 954 (7th Cir. 2000); United States v. Ewings, 936 F.2d 903, 907-08 (7th Cir. 1991).

In any event there is no serious doubt that she killed the child. Her motive, and her awareness that she could obtain money by means of false claims against insurance companies, are not in doubt. She had motive and means (not merely to file a false claim, but to kill the child), and of course opportunity (she just needed to be alone with the child for a few minutes). Not that these circumstances alone would be sufficient to convict, but there was much more. The fact that she took out a $200,000 life-insurance policy on her infant a month before it died even though she was on public aid and deeply in debt for her gambling losses and the infant's death would not have imposed significant costs on her is suspicious. What is more, a previous child of hers had died, supposedly another case of SIDS. That child had not been insured, but it is possible that the defendant murdered her in order to avoid the expense of caring for her; she already had two children. The defendant argues that the previous death indicated a genetic predisposition that might explain the extraordinary coincidence of losing two children to SIDS, but she presented little evidence to support that conjecture (and there apparently is little evidence that could have been presented, see Stedman's Medical Dictionary 1768 (27th ed. 2000)), it was vigorously contested, and the jury was entitled to disbelieve it.

And there is more. The defendant concealed the birth of the child that she is charged in this case with having murdered from her pediatrician (having concealed the pregnancy from her as well), and during the two months of this child's life never brought her to see a doctor. She brought another of her children to the

pediatrician, both before and after Tara's death, yet did not mention Tara to her. Although the emergency-room physician who first examined the dead child accepted the defendant's claim that it was a SIDS death, and the report of the autopsy did not say there had been foul play, the defendant herself had said that there was blood on the child's mouth when she found the corpse and the government's experts testified that the presence of blood was suggestive of suffocation, as were certain small hemorrhages found on the child's heart and chest and the fact that rigor mortis had set in first in the chest. The cause of death stated in the autopsy report, incidentally, was changed from SIDS to "undetermined" when the hospital discovered the death of the defendant's previous child, because of the improbability of a person's having two babies die of SIDS.

The defendant emphasizes the lack of medical certainty concerning the etiology and diagnosis of SIDS. It is a mysterious syndrome. But given how the parties framed the case, all the jury had to do was decide between two hypotheses--that the death was a SIDS death, and that the child had been smothered by her mother. (A third, that deliberate neglect had contributed to the child's death, was not explored--and for the reason explained earlier would not have been helpful to the defendant.) The second hypothesis was far more probable in the circumstances than the first. Taken all in all, the evidence of the defendant's guilt, while circumstantial (there were no witnesses to the suffocation and the defendant did not admit the deed), was sufficient to support the conviction.

Affirmed.