**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 14, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LARRY RUCKER,

Defendant-Appellant.

No. 05-3319
(D.C. No. 04-CR-20150-JWL)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, **McKAY**, and **BRORBY**, Circuit Judges.

---

Defendant Larry Rucker was convicted on five counts related to two armed robberies and was sentenced to 509 months' imprisonment. In this direct appeal, he challenges the sufficiency of the evidence supporting his conviction and the district court's admission of certain evidence. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## I. Background

In a six-count indictment, the government charged Mr. Rucker with two counts of robbery affecting interstate commerce under the Hobbs Act, 18 U.S.C. § 1951; two counts of using, carrying, and brandishing a firearm during and in relation to a crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and (c)(1)(C)(I); and two counts of felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). One of the counts of felon in possession of a firearm, Count 1, related to an incident on September 20, 2004, and was severed from Mr. Rucker's trial on Counts 2-6, which arose from two robberies on October 26, 2004. The first robbery occurred at 6:00 a.m. at the KC Quick Pick, a convenience store located in Kansas City, Kansas, where Toni Quintanar was working alone as a cashier. The store's surveillance cameras recorded the entire robbery. Standing directly across the counter from Ms. Quintanar, the robber asked for a pack of cigarettes, then pulled out a handgun and demanded all the money. She gave him approximately $169.00 in bills, mostly in $1.00 and $5.00 denominations. When the police arrived, Ms. Quintanar described the robber as a 35-40 year old black male, approximately 5'10" to 6' tall, with a heavier build and a beard with gray in it, and wearing a head covering, black pants, and a striped polo shirt. She stated that the robber had used a revolver.

The second robbery occurred around noon on the same day at Bargains to the Max, a thrift store also located in Kansas City, Kansas. The robber entered

the store and asked a few questions of the proprietor, William Craig Packer. There was a customer in the store and the robber quickly left. The robber returned shortly thereafter and, finding Mr. Packer alone, asked him for change for a $5.00 bill. When Mr. Packer went to the register, the robber pulled out a handgun and asked for all the money. Mr. Packer emptied the register of approximately $60.00-$80.00, including both bills and coins. The robber also took a plastic Ziploc bag from a cabinet beneath the counter that contained an unknown amount of additional bills and coins, including rolled coins.

Immediately after the robber left, Mr. Packer called 911 and informed the dispatcher that the robber was a black male with braids or corn rows in his hair and wearing a green camouflage jacket. Within one or two minutes of the robbery, Mr. Packer went outside the store and, noticing an individual a short distance down the street that he believed was the robber, ran after him. That individual was Mr. Rucker. At that time, Officer Thomas Rector drove up, and Mr. Packer pointed out Mr. Rucker to him. Mr. Rucker, who was approximately a block away, then started to run. Officer Rector drove after him but lost visual contact when Mr. Rucker turned a corner. When another responding officer, Ruben Rodriguez, saw Mr. Rucker run between two houses and into a wooded area, he chased him on foot. During his pursuit, Officer Rodriguez observed Mr. Rucker bend down and place something on the ground. After a short chase, Officer Rodriguez caught Mr. Rucker, who at that time was barefoot and had

-3-

slipped and fallen in the wet conditions. Mr. Rucker resisted, and Officer Rodriguez and other officers who arrived during the struggle subdued him.

Another officer who arrived shortly after Mr. Rucker was in custody, John Sledd, retraced Mr. Rucker's route and located a silver .38 caliber handgun in the brush. Mr. Rucker had a Ziploc bag containing fifty-seven $1.00 bills, eight $5.00 bills, two $10.00 bills, $17.00 in quarters, $23.80 in dimes, $9.05 in nickels, $3.79 in pennies, and two rolls of pennies. R. Vol. IV, doc. 68 at 285:1-4. The police brought Mr. Packer over to where Mr. Rucker was in custody, and he identified Mr. Rucker as the robber. A contemporaneous photo of Mr. Rucker reveals that he had braids or corn rows in his hair. *Id.* Supp. Vol. I, Ex. 28.

The next day, detectives presented a photo array to Ms. Quintanar that contained the pictures of six black men, one of whom was Mr. Rucker. *Id.*, Ex. 3. Ms. Quintanar identified him as the KC Quick Pick robber.

At trial, Ms. Quintanar again identified Mr. Rucker. She also identified the shirt he was wearing when he was apprehended as the same shirt worn by the KC Quick Pick robber. Likewise, Mr. Packer again identified Mr. Rucker as well as the jacket he was wearing when he robbed Bargains to the Max. After a trial, a jury returned a unanimous verdict of guilty on Counts 2-6 of the indictment. The district court entered judgment on that verdict and sentenced Mr. Rucker to 509 months. Count 1 was dismissed. Mr. Rucker appeals.

## II. Discussion

Although Mr. Rucker explicitly sets forth two issues in his opening brief, the sufficiency of the evidence and the district court's admission of certain evidence, we have identified a third issue that he refers to somewhat obliquely— the district court's denial of his motion to suppress Ms. Quintanar's identification of him from the photo lineup. We address each of these issues below.

### A. Sufficiency of the evidence.

Mr. Rucker contends that there was insufficient evidence supporting his conviction on Counts 2-6 of the indictment. We review sufficiency of the evidence claims de novo. *United States v. Williams*, 376 F.3d 1048, 1051 (10th Cir. 2004). "In doing so, we view the evidence in the light most favorable to the government and determine whether a reasonable jury could have found the defendant guilty of the crime beyond a reasonable doubt." *Id*. We do not "weigh conflicting evidence or second-guess the fact-finding decisions of the jury." *United States v. Summers*, 414 F.3d 1287, 1293 (10th Cir. 2005). Rather, we must determine whether, "based on the direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom," the jury's verdict was supported by sufficient evidence, *United States v. Smith*, 133 F.3d 737, 742 (10th Cir. 1997).

Mr. Rucker argues that the identifications made by Ms. Quintanar and Mr. Packer were too unreliable for a reasonable jury to base a finding of guilt

beyond a reasonable doubt on them. In support of this argument, Mr. Rucker points to Ms. Quintanar's failure to notice or mention a scar beneath Mr. Rucker's eye despite testifying that she was focused almost exclusively on the robber's eyes during the robbery. He also points to Mr. Packer's description of the robber as 5'7" to 5'8" tall and wearing blue jeans, whereas Mr. Rucker is 6' tall and was wearing black jeans when he was apprehended. Despite these minor discrepancies, however, both Ms. Quintanar and Mr. Packer accurately described other characteristics of Mr. Rucker, and they each identified Mr. Rucker before and during trial. Accordingly, there was sufficient evidence from which a reasonable juror could conclude that their identifications were reliable, and we will not reweigh evidence or assess eyewitness credibility in determining the sufficiency of the evidence supporting identifications, *see United States v. Waldron*, 568 F.2d 185, 186-87 (10th Cir. 1977) (per curiam).

Mr. Rucker also argues that Ms. Quintanar's description of the robber as 5'10" to 6' tall is clearly contradicted by the surveillance video of the KC Quick Pick robbery, which was admitted into evidence and viewed by the jury. Ms. Quintanar, who is 5'1" in height, was standing on a cashier platform that was 6" to 12" in height, making her effective height 5'7" to 6'1" in relation to the floor on which the robber was standing. Mr. Rucker reasons that, because it appears in the video that Ms. Quintanar is taller than the robber, the robber could be no more than 5'8" tall.

After viewing the video, *see* R. Supp. Vol. II, Ex. 6, we cannot say that it appears the robber is no more than 5'8" tall. The primary deficiency is that the video does not provide the degree of accuracy necessary to draw the four-inch distinction Mr. Rucker would have the jury make. His theory also fails to take into account the position of the video camera above and behind Ms. Quintanar, which could make even a 6' tall individual appear somewhat shorter than her. Finally, there is not such a great disparity in the video between the relative apparent heights of Ms. Quintanar and the robber such that a reasonable jury could find the robber to be no taller than 5'8".

Mr. Rucker further contends that still photographs from the video, R. Supp. Vol. II, Exs. 1 & 2, show two characteristics that he does not possess–a mole or other mark on his cheek and a scar or birthmark across his neck and shoulder. On this issue, the government presented evidence from Thomas Wheeler, a crime scene investigator for the Kansas City, Kansas, Police Department, who processed the video and produced the still photos. Mr. Wheeler testified that the still photos were distorted because the printer printed in pixels, or small squares, whereas the video is represented in lines. *Id.* Vol. III, doc. 67 at 238:19-23. The jury had the opportunity to view the video, which provides a clearer image of the robber's characteristics than the still photos. Based on Mr. Wheeler's testimony and the video, a reasonable jury could conclude that the characteristics Mr. Rucker

focuses on in the still photographs are distortions or, as the government argues, the effects of lighting, not moles, scars, or other marks.

Mr. Rucker also asserts that the video does not show the scar he has under his right eye. However, the video does not provide a sufficiently clear view of the area beneath Mr. Rucker's eye from which a reasonable jury could find that the robber did not have a scar.

Mr. Rucker raises several other points concerning the sufficiency of the evidence. He argues that there was never any compelling evidence that he ever possessed the gun recovered by Officer Sledd. He further contends that Officer Rodriguez's testimony that Mr. Rucker bent down and placed something on the ground during the chase is belied by Officer Sledd's testimony that he never observed Mr. Rucker do so. Rather, Mr. Rucker contends that the gun could already have been there in the deep brush, and he points out that it was never processed for fingerprints.

Several pieces of testimony fatally undermine these points and lead us to conclude that there was sufficient evidence from which a reasonable jury could conclude that the gun belonged to Mr. Rucker. Officer Sledd testified that, after viewing the early portion of the pursuit from his patrol car, he parked, put on his vest, and proceeded on foot along the outside of the wooded area. He stated that he "could hear officers yelling to [Mr. Rucker]" and that he "could tell they had him in custody." *Id.* Vol. III, doc. 67 at 228:18-20. He then went into the woods

and found that the other officers had restrained Mr. Rucker.  The clear implication of this testimony is that Officer Sledd did not see the whole chase.  Thus, it would be reasonable for the jury to find that Mr. Rucker could have set the gun down when Officer Sledd was not watching.  Mr. Rucker's theory that the gun could already have been there is wholly speculative and does not undermine the jury's contrary finding.

The fact that the gun was not processed for fingerprints was explained by the crime scene investigator, Mr. Wheeler, who testified that the gun was very wet and that moisture washes fingerprints off.  *Id.* at 251:15-18.  He also testified that, due to the way a gun is handled, he rarely has been successful in recovering a workable latent fingerprint from a firearm.  *Id.* at 253:13-16.  Accordingly, a reasonable jury could discount the failure to process the gun for fingerprints.

Finally, Officer Sledd testified that he backtracked along the path of the chase and found the gun, and Officer Rodriguez testified that the gun was found at the point he saw Mr. Rucker bend over and place something on the ground. Mr. Packer, who described himself as somewhat familiar with guns, also testified that he observed copper-jacketed ammunition in the cylinder of the silver gun the robber pointed at him, which he believed to be a .357 Magnum.  The gun that was recovered contained the same type of bullets and was a silver .38 caliber handgun. According to the testimony of Bruce Stukey, an employee of the Bureau of Alcohol, Tobacco, and Firearms who is an interstate nexus expert with respect to

firearms, a .38 is very similar to a .357 Magnum, which would explain Mr. Packer's misidentification. Thus, we conclude that there was ample evidence linking the recovered gun to Mr. Rucker.

Mr. Rucker suggests that his proffered explanation for what he was doing at the time of the robberies and why he had small bills and change when he was apprehended undermines the jury's verdict. His version of events, and the contrary evidence, may be summarized as follows. He claims that he was sleeping at his sister's house in Kansas City at 6:00 a.m. on October 26 when the KC Quick Pick was robbed. His sister testified, however, that he slept there but was already awake when she got up at 7:00 a.m., and Ms. Quintanar, of course, identified him as the robber. He claims that, at noontime, he had been drinking and left his shoes on his nephew's porch when he decided to follow two women with whom he was acquainted in order to flirt with them. He also claims he ran because he was scared—an officer, without reason, had injured him a few weeks earlier. However, Officer Rodriguez testified that there were many places where Mr. Rucker could have hidden or lost his shoes during the chase through the wet, muddy woods, and another officer, as discussed below, refuted Mr. Rucker's motive for running. Mr. Rucker contends that he won the small bills and change he possessed playing cards with his nephews and nieces at his sister's house the night before, a story that his sister corroborated, and that a woman had given him some money for working on her car. However, the money taken from the two

robberies consisted mostly of small bills and change, albeit in an uncertain amount. Based on the foregoing, we conclude that sufficient evidence supported the government's version of events and a reasonable jury could choose not to believe Mr. Rucker's version.

B. Admission of Ms. Quintanar's pre-trial identification.

Mr. Rucker filed a motion to suppress the pre-trial identifications made by both Ms. Quintanar and Mr. Packer on the ground that they violated his Fifth Amendment due process rights. Although the government contends that Mr. Rucker has not challenged the district court's denial of that motion, he listed it in his docketing statement. An issue listed in a docketing statement but not briefed, however, is considered abandoned. *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 979 n.43 (10th Cir. 1990). In his appellate briefs, Mr. Rucker argues only that a reasonable juror could not base a guilty verdict on Mr. Packer's identification because it was too unreliable (an argument we have already rejected), not that the pre-trial identification was admitted in violation of his due process rights. Thus, Mr. Rucker has abandoned any challenge to the admissibility of Mr. Packer's pre-trial identification. However, Mr. Rucker does argue that Ms. Quintanar's identification of him as the KC Quick Pick robber "is explained by the fact that she was shown a photo lineup in which only one person – Rucker – had the only important facial feature that [Ms.] Quintanar described to police, i.e., a full beard with gray in it." Aplt. Opening Br. at 12. We construe

-11-

this statement as sufficiently preserving for appeal the district court's denial of the motion to suppress Ms. Quintanar's pre-trial identification.

"[T]he ultimate conclusion of the constitutionality of identification procedures is a mixed question of law and fact which is subject to de novo review." *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000). Any pertinent factual findings, however, are reviewed for clear error. *Id.* After carefully reviewing the record, we conclude that, for substantially the same reasons as set forth in the district court's well-reasoned order, the pre-trial identification procedure used with Ms. Quintanar likely was unnecessarily suggestive but nevertheless did not violate Mr. Rucker's Fifth Amendment due process rights. *See* R. Vol. I, doc. 26 at 15-16, 20-23.

C.     Admission of Officer Dundovich's testimony.

Mr. Rucker testified on direct examination that he had run from Officer Rector on October 26 because an officer had "jumped" him two weeks earlier and he required stitches to his face. R. Vol. IV, doc. 68 at 329:14-23. On cross-examination, the government asked Mr. Rucker, "Tell the jury, Mr. Rucker, about this incident that happened – that you claim happened two weeks before where the police had jumped on you." *Id.* Vol. IV, doc. 68 at 357:14-17. The gist of his response was that he fled from Officer Dion Dundovich because he thought the officer was trying to hit him with his patrol car. After a brief chase, another officer apprehended him, and he was lying on the ground in handcuffs

when Officer Dundovich arrived, approached him, and kicked him in the face, dropped him on the back of his head, and punched him in the eye.

The government then advised the court that it intended to call Officer Dundovich as a rebuttal witness. The district court overruled Mr. Rucker's objection, reasoning that he had "opened the door" by implying that he had been assaulted on September 20 for no reason and that the government was entitled to present rebuttal evidence showing that there had been a valid reason for Officer Dundovich's actions. *Id.* at 361:21 to 362:23; *see also* 391:25 to 393:9 (addressing Mr. Rucker's renewed objection). Officer Dundovich then testified that, as he drove up alongside Mr. Rucker to ask him some questions, he observed Mr. Rucker draw a gray metal object from his waist, drop it on the ground with a distinctive metallic sound, and begin to run. Believing the object to be a gun, he pursued and apprehended Mr. Rucker and, during the ensuing scuffle, Mr. Rucker sustained the cut beneath his eye. Officer Dundovich then went back and recovered a .45 caliber handgun where Mr. Rucker had dropped it. Count 1 arose from this incident, and the district court had severed it from Counts 2-5 on misjoinder principles pursuant to Fed. R. Crim. P. 8, *see* R. Vol. I, doc. 26 at 6.[1]

---

[1]     Although the court also discussed prejudice and the possibility of giving a limiting instruction, that was not the basis for its order. *See* R. Vol. I, doc. 26 at 9-10.

Mr. Rucker argues that he did not "open the door" for the admission of Officer Dundovich's testimony because his own testimony was admissible—it was true, went only to his state of mind on October 26, and did not unfairly prejudice the government. He argues in the alternative that any door he might have opened did not entitle the government to introduce evidence that he possessed a firearm on September 20. We disagree on both points.

"Opening the door" is also referred to as the doctrine of "curative admissibility." *See United States v. Morales-Quinones*, 812 F.2d 604, 609-10 (10th Cir. 1987). It "is limited to the prevention of prejudice and used only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." *Id.* at 610 (quotation omitted). We have described the general rule thus:

> A party, having himself opened the door to evidence which is inadmissible for the reason that it is not the proper method of establishing or resisting the issues in the case, cannot complain that thereafter the court in the exercise of its sound judicial discretion permitted the opposite party to introduce other testimony bearing upon that field of inquiry, even though under different circumstances the testimony would be subject to valid objection of inadmissibility.

*United States v. Regents of N.M. Sch. of Mines*, 185 F.2d 389, 391 (10th Cir. 1950); *see also United States v. Davis*, 183 F.3d 231, 256 (3d Cir.) (explaining that the doctrine of curative admissibility first requires the introduction of inadmissible evidence that gives a false impression), *amended*, 197 F.3d 662 (3d Cir. 1999). "Admission of rebuttal evidence, particularly when the defendant

-14-

'opens the door' to the subject matter, is within the sound discretion of the district court." *United States v. Troutman*, 814 F.2d 1428, 1450 (10th Cir. 1987).

Mr. Rucker's testimony on direct examination that he was "jumped" by an officer and required stitches was a reference to the facts underlying Count 1, which the district court, at Mr. Rucker's request, had severed. Generally, "evidence relevant *only* to a particular count in the indictment becomes irrelevant if the count is severed; but relevant evidence is unaffected." *United States v. Abdelhaq*, 246 F.3d 990, 993 (7th Cir. 2001). In the abstract, the facts underlying Count 1 were irrelevant to the remaining counts; indeed, this is the apparent reason the district court severed it. Therefore, that evidence was inadmissible. *See* Fed. R. Evid. 402 (irrelevant evidence is inadmissible). As the district court noted, it was Mr. Rucker's choice to make those facts relevant and, hence, admissible. *See* R. Vol. IV, doc. 68 at 392:25 to 393:9. Accordingly, we conclude that the curative admissibility doctrine's prerequisite, the inadmissibility of the evidence that opens the door, was satisfied in this case.

Mr. Rucker's extended narrative in response to the government's open-ended questions on cross-examination is relevant to determining the extent to which he opened the door. That testimony prejudiced the government by establishing a motive for running from Officer Rector other than that he had just robbed Bargains to the Max, and its truth was at issue. Absent an opportunity to rebut that testimony by describing the reason Officer Dundovich had chased

-15-

Mr. Rucker in the first place and scuffled with him, namely, dropping the gun, the prejudice to the government would have been unfair. The district court, therefore, did not abuse its discretion in admitting Officer Dundovich's testimony.

The district court instructed the jury that it could consider Officer Dundovich's testimony only insofar as it affected the credibility of Mr. Rucker's proffered reason for running from Officer Rector, not as evidence that Mr. Rucker was more likely to have possessed a gun on October 26. We generally presume juries follow limiting instructions and place a heavy burden of persuasion on those who urge otherwise. *United States v. Carter*, 973 F.2d 1509, 1513-14 (10th Cir. 1992). Because the other evidence identifying Mr. Rucker as the robber of both the KC Quick Pick and Bargains to the Max and tying him to the gun was sufficiently strong to convict him regardless of Officer Dundovich's testimony that he possessed a gun on September 20, we see no reason to deviate from this presumption.

### III. Conclusion

For the reasons stated above, we AFFIRM Mr. Rucker's conviction.

Entered for the Court

Monroe G. McKay
Circuit Judge